## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| MANUEL ESQUIVEL, individually and as a representative of a class of similarly situated persons, on behalf of the WHATABURGER 401(K) SAVINGS PLAN (f/k/a the Whataburger Profit Sharing and 401(k) Savings Plan),<br><br>Plaintiff,<br><br>v.<br><br>WHATABURGER RESTAURANTS LLC; THE BOARD OF DIRECTORS OF WHATABURGER RESTAURANTS LLC; THE WHATABURGER 401(K) SAVINGS PLAN ADMINISTRATIVE COMMITTEE (f/k/a the Whataburger Profit Sharing and 401(k) Savings Plan Administrative Committee); and DOES No. 1–20, Whose Names Are Currently Unknown,<br><br>Defendants. | Case No. 5:24-cv-310 |

## CLASS ACTION COMPLAINT

## I.    INTRODUCTION

1.    Plaintiff, Manuel Esquivel ("Plaintiff"), on behalf of the Whataburger 401(k) Savings Plan f/k/a the Whataburger Profit Sharing and 401(k) Savings Plan ("Plan") and a proposed class ("Class") of participants and beneficiaries in the Plan, brings this action ("Action") under 29 U.S.C. § 1132, against Defendants, Whataburger Restaurants LLC ("Whataburger"), the Board of Directors of Whataburger Restaurants LLC ("Board"), the Whataburger 401(k) Savings Plan Administrative Committee f/k/a the Whataburger Profit Sharing and 401(k) Savings Plan Administrative Committee ("Administrative Committee" or "Committee"), and Does No. 1–20, who are current or former members of the Board and Committee or other fiduciaries of the Plan whose names are currently unknown (collectively, "Defendants"), for breaches of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*., and related breaches of applicable law beginning six years prior to the date the action is filed and continuing to the date of judgment, or such earlier date that the Court determines is appropriate and just ("Class Period").

2.    As employer-provided defined benefit plans have become increasingly rare as a meaningful benefit offered and available to employees, defined contribution plans (*e.g.*, 401(k) plans) qualified as tax-deferred vehicles have become the primary form of retirement saving in the United States and, as a result, the country's *de facto* retirement system. In traditional defined benefit retirement plans, a sponsoring the employer typically promises a calculable benefit and assumes the risk with respect to high fees or underperformance of pension plan assets used to fund defined benefits, since such an employer is responsible for any shortfall in funding to provide the benefits promised. In the context of defined contribution plans, however, participants bear the risk of high fees and investment underperformance.

3.      As of December 31, 2022, the Plan had 9,796 participants with account balances and assets totaling approximately $215 million, placing it in the top 0.2% of all U.S. defined contribution plans by plan participant count and top 0.9% of all U.S. defined contribution plans by total assets.[1]  Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and can demand low-cost administrative and investment management services within the marketplace.  The market for defined contribution retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

4.      Defendants maintain the Plan, and are responsible for selecting, monitoring, and retaining the service providers that provide investment, recordkeeping, and other administrative services.  Defendants are fiduciaries under ERISA, and, as such, owe a series of duties to the Plan and its participants and beneficiaries, including obligations to act for the exclusive benefit of participants, select and maintain prudent and diverse investment options to offer through the Plan, and ensure that Plan expenses are fair and reasonable in relation to the services obtained. These fiduciary duties are well understood to be the "highest known to the law."  *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 294 (citing *Donovan v. Bierwirth*, 680 F.3d 263, 272 n.8 (2d Cir. 1982)).

5.      Defendants breached their fiduciary duties to the Plan.  As detailed below, Defendants failed to appropriately monitor the Plan's investments, resulting in the retention of unsuitable investments in the Plan instead of prudent alternative investments that were readily available at all times Defendants selected and retained the funds at issue and throughout the

---

[1] BrightScope and Investment Company Institute, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2020*, September 2023, available at www.ici.org/files/2023/23-ppr-dcplan-profile-401k.pdf, accessed on January 18, 2024.

Class Period.  Since Defendants have discretion to select the investments made available to participants, Defendants' breaches directly caused the losses alleged herein.

6.    To remedy these fiduciary breaches and other violations of ERISA, Plaintiff brings this class action under Sections 404, 409, and 502 of ERISA, 29 U.S.C. §§ 1104, 1109, and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiff seeks such other equitable or remedial relief for the Plan and the proposed Class as the Court may deem appropriate and just under the circumstances.

7.    Plaintiff specifically seeks the following relief on behalf of the Plan and the Class:

i.    A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

ii.    A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

iii.    Equitable, legal, or remedial relief for all losses and/or compensatory damages;

iv.    Attorneys' fees, costs, and other recoverable expenses of litigation; and

v.    Such other and additional legal or equitable relief that the Court deems appropriate and just under the circumstances.

## II.    THE PARTIES

8.    Plaintiff is a former employee of Whataburger and former participant in the Plan under 29 U.S.C. § 1002(7).  Plaintiff is a resident of San Antonio, Texas.  During the Class Period, Plaintiff maintained an investment through the Plan in the Fidelity Global ex U.S. Index Fund, Invesco Developing Markets Fund, Janus Henderson Triton Fund, Fidelity Extended

Market Index Fund, Vanguard Selected Value Fund, Fidelity 500 Index Fund, MainStay Winslow Large Cap Growth Fund, Dodge & Cox Stock Fund, Galliard Stable Return Fund, Fidelity U.S. Bond Index Fund, JPMorgan Core Bond Fund, Fidelity Freedom Blend Income Fund, Fidelity Freedom Blend 2010 Fund, and Fidelity Freedom Blend 2035 Fund.

9.    Whataburger is a privately-owned fast food restaurant chain headquartered in San Antonio, Texas.  Whataburger is the Plan Sponsor.

10.    The Board appointed "authorized representatives" of Whataburger, including the Administrative Committee, as Plan fiduciaries.  Does No. 1–10 are current and former members of the Board who are fiduciaries of the Plan under ERISA under 29 U.S.C. §§ 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Administrative Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

11.    The Administrative Committee is responsible for the general administration of the Plan and is a fiduciary under ERISA under 29 U.S.C. §§ 1002 and 1102.  The Administrative Committee maintains its address at Whataburger's company headquarters in San Antonio, Texas. The Administrative Committee and its members are appointed by Whataburger or its delegate to administer the Plan on Whataburger's behalf.  Does No. 11–20 are current and former members of the Administrative Committee and, by virtue of their membership, fiduciaries of the Plan or otherwise are fiduciaries of the Plan.

12.    Plaintiff is currently unable to determine the membership of the Board and Committee or the identities of the other fiduciaries of the Plan because, despite reasonable and diligent efforts, it appears that the membership of the Board and Committee or the identities of any other fiduciaries are not publicly available.  As such, these Defendants are named Does as

placeholders. As soon as practicable after their identities are discovered, Plaintiff will move, under Federal Rule of Civil Procedure 15, to amend this Complaint to name the members of the Board, members of the Administrative Committee, and other responsible individuals as Defendants.

### III.    JURISDICTION AND VENUE

13.    Plaintiff seeks relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and U.S.C. § 1132.

14.    This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1331 because the Action arises under the laws of the United States.

15.    Venue is proper in this District pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because Whataburger's principal place of business is in this District and the Plan is administered in this District. Further, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

16.    Plaintiff has standing to bring the action because assets attributable to his Plan account were invested in the investment alternatives challenged in the Action during the Class Period. Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary, or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan. As explained herein, the Plan has suffered millions of dollars in losses due to Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by the Court. And although standing under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiff and all Plan participants also

suffered financial harm as a result of the Plan's imprudent investment options and were deprived of the opportunity to invest in prudent options, among other injuries.

## IV.    FACTUAL ALLEGATIONS

### A.  BACKGROUND AND PLAN STRUCTURE

17.     The Plan is a participant-directed 401(k) plan, meaning participants direct the investment of their contributions into various investment options offered by the Plan.  Each participant's account is credited with their participant contributions, applicable employer matching contributions, any discretionary contributions, and earnings or losses thereon.  The Plan pays expenses from Plan assets, and the majority of administrative expenses are paid by participants as a reduction of investment income.  Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses.  The investment options made available to Plan participants include various mutual funds and collective trust funds.

18.     Mutual funds are publicly traded investment vehicles consisting of a pool of monetary contributions collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the U.S. Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation and required to provide certain investment and financial disclosures and information in the form of a prospectus.

19.     Collective trusts are, in essence, mutual funds without the SEC regulation. Collective trusts fall under the regulatory purview of the Office of the Comptroller of the Currency or individual state banking departments.  Collective trusts were first organized under state law in 1927 and were blamed for the market crash in 1929.  As a result, collective trusts

were severely restricted, giving rise to the more transparent and publicly traded mutual funds described above.  Today, banks create collective trusts only for their trust clients and for employee benefit plans, like the Plan.  Despite their historic lack of transparency, modern collective trust sponsors provide sufficient information for investors to make informed decisions about the merits of investing in collective trusts.  The main advantage of opting for a collective trust, rather than a mutual fund, is the negotiability of the fees.  Accordingly, large retirement plans are able to leverage their size for lower fees.

20.     From the start of the Class Period through January 2, 2022, Plan assets were held in a trust by the Plan trustee Charles Schwab Bank.  Fidelity Management Trust Company ("Fidelity") became the Plan trustee on January 3, 2022.  All investments and asset allocations are performed through this trust instrument.

**B. DEFENDANTS' BREACHES OF FIDUCIARY DUTIES**

21.     As discussed below, Defendants have severely breached their fiduciary duties of prudence and loyalty to the Plan in several ways.  Plaintiff did not acquire actual knowledge of Defendants' breaches until shortly before this Complaint was filed.

**1.  The Plan's Imprudent Investment Options**

22.     The goal of an active manager is to beat a benchmark—usually a market index or a combination of indices—by taking more risk than the relevant index or indices.[2]  It is a basic

---

[2] *See* Ashley Kilroy, *What Is Active Management and Is It Right For You?*, SmartAsset Advisor, LLC, February 16, 2023, available at https://smartasset.com/financial-advisor/active-management, accessed on January 18, 2024 ("[t]he goal of active management is to outperform a specific market index or, in a market downturn, to book losses that are less severe than a specific market index suffers");  Lehman and Modest, *Mutual Fund Performance Evaluation: A Comparison of Benchmarks and Benchmark Comparisons*, Journal of Finance, Vol. XLII, No. 2, June 1987 (evaluating the performance of benchmarks using CAPM and APT, and explaining that the entire purpose of actively managed mutual funds is to exceed the performance of an index/benchmark);  Baks, Metrick, and Wachter, *Should Investors Avoid All Actively Managed*

principle of investment theory that the risks associated with an investment must be justified by its potential returns in order for that investment to be rational.  This principle applies even before considering the purpose of the investment or the needs of an investor.  The Capital Asset Pricing Model ("CAPM")—which is used to price securities and generate expected returns for assets given their risks and the cost of capital—provides the following mathematical formula for this principle:

$$ERi = Rf + \beta i(Erm - Rf), \text{ where:}$$

$ERi$ = the expected return of the investment

$Rf$ = the risk-free rate

$\beta i$ = the beta of the investment

$(Erm - Rf)$ = the market risk premium

23.     Applied here, the beta—$\beta i$—is the risk associated with an actively managed mutual fund or collective trust, which can be justified only if the expected return—$ERi$—is, at the very least, above that of its benchmark, $Rf$.[3]  Otherwise, the model collapses, and it would be imprudent to assume the extra risk without achieving a higher return than the benchmark.

24.     Accordingly, any suggestion that a comparison of actively managed funds to passively managed investments (as a proxy for the specific market index that the actively

---

*Mutual Funds? A Study in Bayesian Performance Evaluation*, Journal of Finance, Vol. LVI, No. 1, February 2001 (observing that, since Jensen in 1968, "most studies have found that the universe of mutual funds does not outperform its benchmarks after expenses" and "evidence indicates that the average active mutual fund should be avoided");  Jensen, *The Performance of Mutual Funds in the Period 1945-1964*, Vol. XXIII, No. 2, May 1968 (explaining that most actively managed mutual funds do not outperform indexes and that only those that outperform indexes can justify the risk and expense from an economic perspective).

[3] In this instance, the index benchmark takes place of the "risk-free" rate, as the investment option is measured against the performance of that investment category, rather than the typical U.S. Treasury Bonds or equivalent government security in a general CAPM calculation.  The Arbitrage Pricing Theory ("APT") likewise dictates the same result.

managed investment attempts to beat) is somehow inappropriate or an "apples to oranges"
comparison in every instance ignores the fundamental purpose and design of active mutual
funds, and is inconsistent with basic investment theory and the prevailing frameworks employed
by prudent fiduciaries.

25.     Indeed, prudent fiduciaries should compare actively managed funds to passively
managed funds or similar indices in order to determine whether a plan is getting the additional
return to justify the increased expense and risk of the active investment.  This, in addition to
other metrics (such as peer relative performance), is exactly what every minimally competent
investment professional does to evaluate an actively managed investment and arguments or
suggestions to the contrary fall far outside mainstream thought in terms of investment
management, basic economics and minimum standards of fiduciary care and prudence.  Indeed,
in promulgating its Final Rule to Improve Transparency of Fees and Expenses to Workers in
401(k)-Type Retirement Plans in February, 2012, the DOL specifically required that plan
sponsors identify benchmarks in the form of an appropriate broad-based securities market index
for each investment offered in the plan, thus specifically recognizing that actively managed
investments must be evaluated against indexes, for which passively managed index funds serve
as an investable proxy.  Performing such a comparative analysis is not merely intended to
determine whether a plan would be better served by a passively managed investment, but rather
whether an actively managed fund is providing value sufficient to justify its retention.

26.     Market research has indicated that investors should be skeptical of certain actively
managed funds' ability to consistently outperform their indices, which is a significant concern
for long-term investors saving for retirement, like Plan participants and beneficiaries.  Indeed,
Morningstar has repeatedly concluded that "in general, actively managed funds have failed to

survive and beat their benchmarks, especially over longer time horizons."[4]  Although they may

experience success over shorter periods, active fund managers are infrequently able to time their

activity efficiently enough to outperform the market.  This is not to suggest that active

management is inappropriate for use in a retirement plan lineup, but that plan fiduciaries must

carefully analyze each active fund's ability to provide value and, if they deem a fund does not,

replace it with an active or passive fund that has demonstrated such capabilities.

      27.     In this environment, prudent fiduciaries scrutinize investment managers to

determine whether an active manager has presented an ability to exploit inefficiencies in their

chosen sector of the market.  To do so, and distinguish between a skilled manager and a lucky

one, fiduciaries judge fund performance against both an appropriate index benchmark and a

universe of similar funds over periods most closely approximating a market cycle—namely,

three- and five-year intervals.  These time horizons are emphasized by virtually all competent

investment professionals as sufficient to gauge a fund manager's ability to execute their strategy.

In addition, these two specific time horizons (three- and five-year trailing performance) are the

specific time-frames that almost all investment policy statements identify as the most important

to review in connection with review of 401(k) investments.[5]

---

[4] Ben Johnson, *How Actively and Passively Managed Funds Performed: Year-End 2018*, MORNINGSTAR (Feb. 12, 2019), www.morningstar.com/insights/2019/02/12/active-passive-funds.  *See also* Kilroy, Is Active Management a Good Idea for Your Portfolio (SmartAsset Advisor, LLC) (December 11, 2019), https://smartasset.com/financial-advisor/active-management (there is controversy around the performance of active managers and if they produce superior returns. In fact, over the past 15 years, 92.43% of large-cap managers, 95.13% of mid-cap managers, 97.70% of small-cap managers failed to surpass their benchmark index. Also, over three years, active managers underperformed the market by 0.36%.)

[5] Although it may be tempting to somewhat simplistically suggest that 10 year performance, for example, is more important since the plans at issue are retirement plans, any such suggestion is eschewed by competent and principled investment professionals for at least several important reasons: (1) waiting for 10 years to determine whether the performance of an investment is

28.    A prudent investment monitoring process will regularly review fund performance against a relevant index and peer group for the most recent calendar quarter end over the previous three- and five-year periods, as well as several preceding three- and five-year periods, in order to discern any pattern of underperformance.  Through this lens, if a fund exhibits a persistent inability to exceed the returns of its market index and/or rank in the top 50 percent among its peers, prudent fiduciaries perform a detailed review of the fund and investigate potential replacements.[6]

29.    Index comparisons are particularly important in efficient U.S. large cap space.  As discussed above, active managers face an uphill battle to provide value by consistently beating their benchmarks and compensating for fees higher than those funds that simply track the benchmark.  The domestic large cap space is particularly difficult: Morningstar concluded in its year-end 2018 report on active versus passive management that long term success rates (a fund's ability to survive and outperform a low-cost index fund tracking its benchmark over longer time horizons) were lowest among U.S. large cap funds.  Accordingly, prudent fiduciaries are

---

acceptable is simply too long because losses that can accrue over such a prolonged period can be devastating to an investor and are almost always unrecoverable in nature; (2) in light of labor market flexibility in the United States (with the average employee holding a position for slightly more than four years, *i.e.* between three and five years), the average participant does not remain invested in the same 401(k) plan or retirement instruments for as long as 10 years, *see* Department of Labor, Bureau of Labor Statistics News Release: Employee Tenure in 2022 (September 22, 2022), https://www.bls.gov/news.release/pdf/tenure.pdf; and (3) the average market cycle is less than 10 years and, therefore, as a matter of investment theory and management, it is not the most important or meaningful benchmark with respect to performance.

[6] The degree of cumulative underperformance that prudent fiduciaries consider to be material varies by investment type and asset class. For example, the underperformance that a large cap fund experiences before such underperformance is material is not the same degree of underperformance that a real estate fund or foreign investment fund experiences before such underperformance is material.  As explained below, the degree of underperformance experienced by the challenged investments was material and should have prompted Defendants to investigate and remove the funds.

concerned with actively managed funds' ability to add value in excess of the benchmark, particularly with the domestic large cap strategies.

30.     To that end, to measure the value added or subtracted by a portfolio manager, prudent fiduciaries and investment professionals scrutinize a fund's alpha, defined by Morningstar as a measure of the difference between a portfolio's actual returns and its expected performance, given its level of risk as measured by beta.  This risk is the risk of the relevant market index.  A positive alpha indicates that the portfolio has performed better than its beta would predict; a negative alpha indicates the fund has underperformed expectations based on the risk assumed.  Said more simply, alpha represents the return on an investment that is not attributable to the movement of the market.

### i.    The MainStay Winslow Large Cap Growth Fund

31.     The MainStay Winslow Large Cap Growth Fund Class R1 ("MainStay Fund") was retained as a Plan investment option despite an inability to support an expectation of performance sufficient to justify its retention, including as evidenced by its consistent and significant underperformance relative to its benchmark, the Russell 1000 Growth Index, and prolonged negative alpha, demonstrating a persistent inability to add value in excess of the benchmark.  However, due to the Committee's investment review procedures, a general lack of understanding of how to evaluate investment returns, and/or a general attitude of neglect toward the Plan, Defendants failed to appropriately scrutinize, and ultimately replace the investment. The below performance data represent information that was easily accessible to the Committee during the Class Period and would have been reviewed by prudent fiduciaries.

32.     By the start of the Class Period, as of the end of the First Quarter of 2018, the MainStay Fund's three- and five-year returns had trailed those of the benchmark for all of the

previous **nine consecutive quarters**.  The MainStay Fund's three- and five-year alpha was dramatically negative for ***all of those same previous time periods***.  The prevailing standard of care for investment monitoring demands awareness and consideration of *rolling* performance to identify trends of out- or underperformance.  Underperformance over a three- or five-year period is a cause for concern and scrutiny, and can itself be reason to remove an investment from a plan. In any event, prudent fiduciaries will seek to understand the reasons for the underperformance and closely monitor the investment to see if it subsequently outperforms.[7]  Underperformance over several consecutive three- or five-year trailing periods is a cause for both alarm and action. These metrics, illustrated in the table below, incorporate over ***seven years*** of data, since the earliest period presents metrics speaking to the previous three and five years.  Accordingly, the red flags associated with the MainStay Fund were not passing or short-term in nature from the perspective of the beginning of the Class Period.

| MainStay Winslow Large Cap Growth | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1Q16 | 2Q16 | 3Q16 | 4Q16 | 1Q17 | 2Q17 | 3Q17 | 4Q17 | 1Q18 |
| 3-Year Return vs Benchmark | (2.21) | (1.83) | (2.23) | (4.03) | (2.70) | (1.64) | (1.79) | (2.72) | (0.76) |
| 3-Year Alpha | (3.31) | (2.89) | (3.07) | (4.42) | (3.36) | (2.30) | (2.76) | (3.58) | (1.99) |
| | | | | | | | | | |
| 5-Year Return vs Benchmark | (2.70) | (2.41) | (1.62) | (2.44) | (2.59) | (1.22) | (1.26) | (1.68) | (0.58) |
| 5-Year Alpha | (4.15) | (3.88) | (3.70) | (3.93) | (3.89) | (2.67) | (2.70) | (3.12) | (2.05) |

33.    Accordingly, a fiduciary prudently evaluating the MainStay Fund at the start of the Class Period would have noted its persistent inability to add value in excess of the benchmark.  Such underperformance relative to the market segment in which the MainStay Fund operates persisted, as detailed below.  The MainStay Fund's repeated failure to generate long-term returns that exceeded the benchmark or achieve its expected return given its assumed level

---

[7] It should be noted that "improved" or lessening underperformance over time is still just that: underperformance.  A fund manager that persistently fails to outperform, however great or slight the underperformance, persistently fails to add value.

of risk should have been sufficient to convince a fiduciary prudently monitoring its performance to remove the troubled investment; that the MainStay Fund was retained by the Committee despite persistently demonstrating such shortcomings represents a severe breach of fiduciary duty.

34.    The worrying signs associated with the MainStay Fund continued from the start of the Class Period.  Had the Committee met to appropriately review the Plan's investment results as of the end of the Second Quarter of 2018, it would have noted that the MainStay Fund's three-year return trailed the return of the Russell 1000 Growth Index by 0.51% annualized, while the MainStay Fund's five-year return trailed the benchmark return by 0.11% annualized.  Similarly, the MainStay Fund's three- and five-year alpha were -2.38 and -1.79, respectively, demonstrating a negative value added by the portfolio manager for those periods.

35.    Had the Committee met to appropriately review the Plan's investment results as of the end of the Third Quarter of 2018, it would have noted that the MainStay Fund's three-year return trailed the return of the Russell 1000 Growth Index by 0.55% annualized, while the MainStay Fund's five-year return trailed the benchmark return by 0.90% annualized.  Similarly, the MainStay Fund's three- and five-year alpha were -2.14 and -2.27, respectively, demonstrating a negative value added by the portfolio manager for those periods.

36.    Had the Committee met to appropriately review the Plan's investment results as of the end of the Fourth Quarter of 2018, it would have noted that the MainStay Fund's three-year return trailed the return of the Russell 1000 Growth Index by 0.97% annualized, while the MainStay Fund's five-year return trailed the benchmark return by 1.00% annualized.  Similarly, the MainStay Fund's three- and five-year alpha were -1.53 and -1.59, respectively, demonstrating a negative value added by the portfolio manager for those periods.

37.    At this point, had it engaged in an appropriate ongoing review of the MainStay Fund, the Committee would have been aware as of its meeting following the Fourth Quarter of 2018 of the MainStay Fund's performance shortcomings against the benchmark, which stretched back several years on both a three- and five-year basis, and its persistent inability to generate alpha over the same time frame, thus providing investors with no additional return for the added risk and cost of the actively managed strategy.  The foregoing trend represented compelling information requiring a serious and deliberate decision as to whether there was any basis to retain the MainStay Fund, as sustained underperformance is the clearest indication of a manager's inability to provide value.  However, Defendants ignored or were otherwise unaware of the troubling pattern of rolling returns, failed to investigate a replacement for the MainStay Fund, and allowed it to linger even as its performance issues persisted.

38.    Though the MainStay Fund's three-year returns exhibited some modest improvement in 2019 and 2020, its longer-term five-year rolling track record remained unfavorable.  Had the Committee met to appropriately review the Plan's investment results as of the end of the First Quarter of 2019, it would have noted that the MainStay Fund's five-year return trailed the return of the Russell 1000 Growth Index by 0.20% annualized, while its five-year alpha was -1.03, still demonstrating a negative value added by the portfolio manager.

39.    Had the Committee met to appropriately review the Plan's investment results as of the end of the Second Quarter of 2019, it would have noted that the MainStay Fund's five-year return trailed the return of the Russell 1000 Growth Index by 0.08% annualized, while its five-year alpha was -0.59, demonstrating a negative value added by the portfolio manager.

40.    Had the Committee met to appropriately review the Plan's investment results as of the end of the Third Quarter of 2019, it would have noted that the MainStay Fund's five-year

return trailed the return of the Russell 1000 Growth Index by 0.55% annualized, while its five-year alpha was -1.07, demonstrating a negative value added by the portfolio manager.

41.    Had the Committee met to appropriately review the Plan's investment results as of the end of the Fourth Quarter of 2019, it would have noted that the MainStay Fund's five-year return trailed the return of the Russell 1000 Growth Index by 0.99% annualized, while its five-year alpha was -1.45, demonstrating a negative value added by the portfolio manager.

42.    At this point, consistent with their regular monitoring duties, the Committee should have been aware of the MainStay Fund's dismal trend: through the end of 2019, the MainStay Fund had a negative five-year alpha and rolling five-year returns that trailed the benchmark in each of the previous *sixteen consecutive quarters*.  Such blatant indicators of the imprudence of the continued retention of the MainStay Fund should have been sufficient to convince Defendants to investigate a replacement, but were inexplicably ignored.  The MainStay Fund experienced a brief period of outperformance over the five-year time horizon in 2021 before resuming its sub-benchmark standard and negative alpha in 2022 and 2023; its three-year metrics have been below the benchmark and shown negative alpha from 2021 to date.

43.    As is clearly exhibited by the consistently weak performance shown above, the MainStay Fund has never been an appropriate investment option for the Plan.  When an investment option's track record is so poor, as is apparent here, Defendants should necessarily replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, in such an efficient segment of the market, retain an alternative that tracks the benchmark.  While the low-cost Russell 1000 Growth Index Fund I offered by Vanguard provided investors the opportunity to track the returns of the Russell 1000 Growth Index for the duration of the Class Period, alternative actively managed large cap growth

funds like the Fidelity Growth Company Fund K ("Fidelity Fund") and JPMorgan Large Cap

Growth Fund R6 ("JPMorgan Fund") provided investors with consistent added value: from the

First Quarter of 2018 through the Fourth Quarter of 2023, the three-year returns of the Fidelity

Fund trailed the benchmark just twice, while its five-year returns never trailed the benchmark;

over the same 24-quarter period, the three-year returns of the JPMorgan Fund trailed the

benchmark just four times, while its five-year returns trailed the benchmark just once. At all

relevant times the three- and five-year returns of the Fidelity and JPMorgan Funds ranked in the

top half of their peer group.

44.    Investors largely recognized and reacted to the MainStay Fund's consistently poor

results, as Morningstar's net asset flows to/from the MainStay Fund demonstrate a pattern of

capital flight concurrent with the strategy's underperformance. At the end of 2014, the MainStay

Fund (all share classes) had approximately $20 billion in assets under management ("AUM"),

but due in large part to net outflows well in excess of $1 billion per year, had approximately $11

billion in AUM as of the end of 2022. Simply put, other investors monitoring the performance

of the MainStay Fund were able to recognize the red flags associated with the fund and

overwhelmingly withdrew their assets. If Defendants' monitoring of the Plan's investments had

been appropriate, they would have done the same.



45.    Despite transparent and persistent red flags and the availability of investment

options that provided the benchmark returns at low cost, as well as several prudent alternative

actively managed large cap growth options, Defendants failed to appropriately monitor the MainStay Fund throughout the Class Period and neglected to replace the underachieving investment option in a severe breach of fiduciary duty.

### ii.    The Janus Henderson Triton Fund

46.     The Janus Henderson Triton Fund Class T ("Janus Fund") was also retained as a Plan investment option despite an inability to support an expectation of performance sufficient to justify its retention, including as evidenced by its consistent and significant underperformance relative to its benchmark, the Russell 2500 Growth Index, and peer funds and prolonged negative alpha, demonstrating a persistent inability to add value in excess of the benchmark.  However, due to the Committee's investment review procedures, a general lack of understanding of how to evaluate investment returns, and/or a general attitude of neglect toward the Plan, Defendants failed to appropriately scrutinize, and ultimately replace the investment.  The below data represent information that was easily accessible to the Committee during the Class Period and would have been reviewed by prudent fiduciaries.

47.     Had the Committee met to appropriately review the Plan's investment results as of the end of the First Quarter of 2020, it would have noted that the Janus Fund's three-year return ranked in the 61st percentile among small cap growth funds (as categorized by Morningstar) and trailed the return of the Russell 2500 Growth Index by 2.00% annualized, while the Janus Fund's five-year return ranked in the 55th percentile among peers and trailed the benchmark return by 0.58% annualized.  Similarly, the Janus Fund's three- and five-year alpha were -1.87 and -0.47, respectively, demonstrating a negative value added by the portfolio manager for those periods.

48.     Had the Committee met to appropriately review the Plan's investment results as of the end of the Second Quarter of 2020, it would have noted that the Janus Fund's three-year return ranked in the 67th percentile among small cap growth funds and trailed the return of the Russell 2500 Growth Index by 3.91% annualized, while the Janus Fund's five-year return ranked in the 58th percentile among peers and trailed the benchmark return by 1.17% annualized. Similarly, the Janus Fund's three- and five-year alpha were -3.36 and -0.82, respectively, demonstrating a negative value added by the portfolio manager for those periods.

49.     Had the Committee met to appropriately review the Plan's investment results as of the end of the Third Quarter of 2020, it would have noted that the Janus Fund's three-year return ranked in the 69th percentile among small cap growth funds and trailed the return of the Russell 2500 Growth Index by 4.97% annualized, while the Janus Fund's five-year return ranked in the 56th percentile among peers and trailed the benchmark return by 1.80% annualized. Similarly, the Janus Fund's three- and five-year alpha were -4.29 and -1.22, respectively, demonstrating a negative value added by the portfolio manager for those periods.

50.     Had the Committee met to appropriately review the Plan's investment results as of the end of the Fourth Quarter of 2020, it would have noted that the Janus Fund's three-year return ranked in the 67th percentile among small cap growth funds and trailed the return of the Russell 2500 Growth Index by 3.94% annualized, while the Janus Fund's five-year return ranked in the 58th percentile among peers and trailed the benchmark return by 1.76% annualized. Similarly, the Janus Fund's three- and five-year alpha were -3.30 and -1.18, respectively, demonstrating a negative value added by the portfolio manager for those periods.

51.     At this point, if the Committee had it engaged in an appropriate ongoing review of the Janus Fund, it would have been aware as of its meeting following the Fourth Quarter of 2020

of the Janus Fund's performance shortcomings against the benchmark and relative to peers over the most recent four consecutive quarters on both a rolling three- and five-year basis. The Janus Fund's established pattern of underperformance against its managers' chosen segment of the market as well as the majority of similar strategies should have been sufficient to convince Defendants to investigate and select a replacement. However, Defendants ignored or were otherwise unaware of the troubling pattern of rolling returns, failed to investigate a replacement for the Janus Fund, and allowed it to linger even as its performance issues persisted, and worsened.

52.     Had the Committee met to appropriately review the Plan's investment results as of the end of the First Quarter of 2021, it would have noted that the Janus Fund's three-year return ranked in the 91st percentile among small cap growth funds and trailed the return of the Russell 2500 Growth Index by 5.55% annualized, while the Janus Fund's five-year return ranked in the 77th percentile among peers and trailed the benchmark return by 2.76% annualized. Similarly, the Janus Fund's three- and five-year alpha were -4.65 and -2.07, respectively, demonstrating a negative value added by the portfolio manager for those periods.

53.     Had the Committee met to appropriately review the Plan's investment results as of the end of the Second Quarter of 2021, it would have noted that the Janus Fund's three-year return ranked in the 85th percentile among small cap growth funds and trailed the return of the Russell 2500 Growth Index by 5.70% annualized, while the Janus Fund's five-year return ranked in the 76th percentile among peers and trailed the benchmark return by 3.17% annualized. Similarly, the Janus Fund's three- and five-year alpha were -4.67 and -2.25, respectively, demonstrating a negative value added by the portfolio manager for those periods.

54.     Had the Committee met to appropriately review the Plan's investment results as of the end of the Third Quarter of 2021, it would have noted that the Janus Fund's three-year return ranked in the 85th percentile among small cap growth funds and trailed the return of the Russell 2500 Growth Index by 5.03% annualized, while the Janus Fund's five-year return ranked in the 76th percentile among peers and trailed the benchmark return by 2.60% annualized. Similarly, the Janus Fund's three- and five-year alpha were -4.19 and -1.78, respectively, demonstrating a negative value added by the portfolio manager for those periods.

55.     Had the Committee met to appropriately review the Plan's investment results as of the end of the Fourth Quarter of 2021, it would have noted that the Janus Fund's three-year return ranked in the 88th percentile among small cap growth funds and trailed the return of the Russell 2500 Growth Index by 4.33% annualized, while the Janus Fund's five-year return ranked in the 69th percentile among peers and trailed the benchmark return by 1.47% annualized. Similarly, the Janus Fund's three- and five-year alpha were -3.14 and -0.75, respectively, demonstrating a negative value added by the portfolio manager for those periods.

56.     This is to say, after years of concerning data, the performance of the Janus Fund remained *worse than more than 85% of all funds in its market segment* for each quarter in 2021. At this point and well earlier, the Committee should have been well aware of the Janus Fund's dismal trend, with *eight consecutive quarters* of three- and five-year underperformance against the benchmark, three- and five-year returns that ranked in the bottom half (and at times in the bottom quartile) of small cap growth funds, and negative three- and five-year alphas. Such blatant indicators of the imprudence of the continued retention of the Janus Fund should have been sufficient to convince Defendants to investigate a replacement, but were inexplicably ignored, and the Janus Fund's negative trend persisted. At the end of 2019, the Janus Fund (all

share classes) had approximately $12 billion in assets under management ("AUM"), but due in large part to net outflows in excess of $1 billion per year, had approximately $7 billion in AUM as of the end of 2022.  Investors largely recognized and reacted to the Janus Fund's consistently poor results, as Morningstar's net asset flows to/from the Janus Fund demonstrate a pattern of capital flight concurrent with the strategy's underperformance.



57.     As is clearly exhibited by the Janus Fund's consistent inability to deliver performance sufficient to justify its retention given its risk and other characteristics, the Janus Fund has never been an appropriate investment option for the Plan.  When an investment option's track record is so poor, as is apparent here, Defendants should necessarily investigate and replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, in such an efficient segment of the market, retain an alternative that tracks the benchmark.  While the low-cost iShares Russell Small/Mid-Cap Index Fund K offered by BlackRock provided investors the opportunity to track the returns of the Russell 2500 Growth Index for the duration of the Class Period, alternative actively managed small cap growth funds like the Wasatch Core Growth Institutional Fund ("Wasatch Fund") and Putnam Cap Growth Fund Y ("Putnam Fund") provided investors with consistent added value: from the First Quarter of 2020 through the Fourth Quarter of 2023, the three- and five-year returns of both funds never failed to exceed the benchmark or rank in the top half of the relevant peer group.

58.     Despite transparent and persistent red flags and the availability of investment options that provided the benchmark returns at low cost, as well as several prudent alternative actively managed small cap growth options, Defendants failed to appropriately monitor the Janus Fund during the Class Period and neglected to replace the underachieving investment option in a severe breach of fiduciary duty.

## IV.    ERISA'S FIDUCIARY STANDARDS

59.     ERISA imposes strict fiduciary duties of prudence and loyalty on the Defendants as fiduciaries of the Plan.  Section 404(a) of ERISA, 29 U.S.C. § 1104(a), states, in relevant part, as follows:

> (1)    a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)    for the exclusive purpose of:
>
> (i)    providing benefits to participants and their beneficiaries; and
>
> (ii)    defraying reasonable expenses of administering the plan;
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
>
> (C)    by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D)    in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

60.     Under 29 U.S.C. § 1103(c)(l), as relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing

benefits to plan participants and their beneficiaries and defraying reasonable expenses of administering the plan.

61.    Under ERISA, parties that exercise any authority or control over plan assets, including the selection of plan investments and service providers, are fiduciaries and must act prudently and solely in the interest of participants in a plan.

62.    ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants. *Donovan*, 680 F.3d at 272 n.8.

63.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. Section 405(a) of ERISA, 29 U.S.C. § 1105(a), provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. Specifically, Section 405(a) of ERISA states:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)    if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

64.    Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under Section 409, 29 U.S.C. § 1109. Section 409(a) of ERISA states, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## V.    CLASS ALLEGATIONS

65.    This Action is brought as a class action by Plaintiff on behalf of himself and the following proposed Class:

> All participants and beneficiaries in the Whataburger 401(k) Savings Plan at any time on or after March 27, 2018, and continuing to the date of judgment, or such earlier date that the Court determines is appropriate and just.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this.

66.    This Action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

67.    **Numerosity.**  Plaintiff is informed and believe that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this Action is impracticable.

68.    **Commonality.**  There are numerous questions of fact and/or law that are common to Plaintiff and all members of the Class, including the following:

> (1)    Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

> (2)    Whether Defendants breached their fiduciary duties under ERISA by failing to (a) act with the care, skill, prudence, and diligence of a prudent person; (b) diversify the investments of the plan so as to

minimize the risk of large losses; (c) act in accordance with the documents and instruments governing the Plan; and

(3)    Whether and what form of relief should be afforded to Plaintiff and the Class.

69.    **Typicality.**  Plaintiff, who is a member of the Class, has claims that are typical of all members of the Class.  Plaintiff's claims and all Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories applicable to all Class members.  In addition, Plaintiff seeks relief for the Plan under the same remedial theories that are applicable to all Class members.

70.    **Adequacy of Representation.**  Plaintiff will fairly and adequately represent the interests of all Class members.  Plaintiff has no conflicts of interest with other Class members and no interests that are different from any other Class other members.  Plaintiff has retained competent counsel experienced in class action and other complex litigation, including ERISA class actions.

71.    **Potential Risks and Effects of Separate Actions.**  The prosecution of separate actions by individual Class members would create a risk of: (1) inconsistent or varying adjudications for individual Class members that would establish incompatible standards of conduct for Defendants; or (2) adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of other Class members not parties to the individual adjudications or would substantially impair or would substantially impair or impede their ability to protect their interests.

72.    **Predominance.**  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court and the parties will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class

member, the calculation of which will ultimately be a ministerial act and which does not bar Class certification.

73.    **Superiority.**  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority of, if not all, Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Further, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

74.    **Manageability.**  This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

75.    Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

76.    Plaintiff's counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure.  Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

77.     Therefore, this action should be certified as a class action under Rules 23(a), and 23(b)(1), or 23(b)(3) of the Federal Rules of Civil Procedure.

## COUNT I
### (For Breaches of Fiduciary Duty Against All Defendants)

78.     Plaintiff incorporates by reference the allegations in the previous paragraphs.

79.     Defendants' conduct, as set forth above, violates their fiduciary duties under Sections 404(a)(1)(A), (B), and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A), (B), and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and: (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; (C) diversify the investments of the Plan so as to minimize the risk of large losses; and (D) act in accordance with the documents and instruments governing the Plan. Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

80.     To the extent any Defendant did not directly commit any breach of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they, or it was a co- fiduciary and knowingly participated in, or concealed, a breach of fiduciary duty by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their, or its specific responsibilities giving rise to his, her, their, or its fiduciary status, or knowingly failed to cure a breach of fiduciary duty by another fiduciary and failed to take reasonable efforts to remedy the breach.

81.     As a direct result of Defendants' breaches of fiduciary duties, the Plan has suffered losses and damages.

82.     Pursuant to Sections 409 and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs, and other recoverable expenses of litigation.

## COUNT II
### (Failure to Monitor Fiduciaries and Co-Fiduciary Breaches
### Against Whataburger and the Board)

83.     Plaintiff incorporates by reference the allegations in the previous paragraphs.

84.     Whataburger, acting through the Board, is responsible for appointing, overseeing, and removing members of the Administrative Committee, who, in turn, are responsible for appointing, overseeing, and removing members of the Committee.

85.     In light of its appointment and supervisory authority, Whataburger and the Board had a fiduciary duty to monitor the performance of the Administrative Committee and its members.  Whataburger, the Board and the Administrative Committee as a whole also had a fiduciary duty to monitor the performance of the members of the Committee.

86.     A monitoring fiduciary must ensure that the monitored fiduciaries perform their fiduciary obligations, including those related to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and its participants when the monitored fiduciaries do not perform their fiduciary obligations.

87.     To the extent that any fiduciary monitoring responsibilities of Whataburger, the Board, or the Administrative Committee were delegated, each Defendant's monitoring duty

included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

88.     Whataburger, the Board, and the Administrative Committee breached their fiduciary monitoring duties by:

> (1)     Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses due to the appointees' imprudent actions and omissions related to the Plan;

> (2)     Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

> (3)     Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent and poorly performing investments in the Plan, all to the detriment of the Plan and its participants' retirement savings.

89.     As a consequence of these breaches of fiduciary duties to monitor, the Plan suffered substantial losses.  If Whataburger, the Board and the Administrative Committee had discharged their fiduciary monitoring duties prudently, the losses suffered by the Plan would have been avoided or minimized.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants lost millions of dollars in retirement savings.

90.     Whataburger, the Board, and the Administrative Committee are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties, alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate.

91.     Each Defendant also knowingly participated in the breaches of fiduciary duties by the other Defendants, knowing that such acts constituted breaches; enabled the other Defendants to commit breaches of fiduciary duties by failing to lawfully discharge their own fiduciary duties; and knew of the breaches of fiduciary duties by the other fiduciaries and failed to make

any reasonable effort under the circumstances to remedy those breaches. Defendants are thus liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

<u>**COUNT III**</u>
**(In the Alternative, Liability for Knowing Breach of Trust Against All Defendants)**

92.    Plaintiff incorporates by reference the allegations in the previous paragraphs.

93.    In the alternative, to the extent that any Defendant is not deemed to be a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust.

94.    To the extent any Defendant is not deemed to be a fiduciary or is not deemed to be acting as a fiduciary for any and all applicable purposes, any such Defendant is liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in these breaches of fiduciary duty by permitting the Plan to offer a menu of imprudent investment options, which was unjustifiable in light of the size and characteristics of the Plan.

<u>**PRAYER FOR RELIEF**</u>

95.    WHEREFORE, Plaintiff, on behalf of himself, the Plan and the Class demands judgment against Defendants for the following relief:

(1)    Declaratory and injunctive relief under Section 502 of ERISA, 29 U.S.C. § 1132, as detailed above;

(2)    Equitable, legal, or remedial relief to return all losses to the Plan and/or for restitution and/or damages as stated above, plus all other equitable or remedial relief as the Court may deem appropriate under Sections 409 and 502 of ERISA, 29 U.S.C. §§ 1109 and 1132;

(3)    Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(4)    Attorneys' fees, costs, and other recoverable expenses of litigation; and

(5) Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of Section 502(h) of ERISA, 29 U.S.C. § 1132(h), the undersigned affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated: March 27, 2024                    Respectfully submitted,


_/s/ John S. "Jack" Edwards, Jr._
John S. "Jack" Edwards, Jr.
Texas Bar No. 24040851
Thomas R. Ajamie
Texas Bar No. 00952400
Eric Chenoweth
Texas Bar No. 24006989
AJAMIE LLP
Pennzoil Place - South Tower
711 Louisiana, Suite 2150
Houston, TX  77002
Telephone:  (713) 860-1600
Facsimile:  (713) 860-1699
jedwards@ajamie.com
tajamie@ajamie.com
echenoweth@ajamie.com

James E. Miller
Laurie Rubinow
MILLER SHAH LLP
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
       lrubinow@millershah.com

James C. Shah
Alec J. Berin
MILLER SHAH LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
        ajberin@millershah.com

Don Bivens
DON BIVENS PLLC
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone: (602) 708-1450
Email: don@donbivens.com

*Attorneys for Plaintiff, the Plan,
and the Proposed Class*