**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| MANUEL ESQUIVEL, individually and as a representative of a class of similarly situated persons, on behalf of the WHATABURGER 401(K) SAVINGS PLAN (f/k/a the Whataburger Profit Sharing and 401(k) Savings Plan),<br><br>Plaintiff,<br><br>v.<br><br>WHATABURGER RESTAURANTS LLC, *et al.*,<br><br>Defendants. | Case No. 5:24-cv-310-XR |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  BACKGROUND ................................................................................................. 3

   A.  The Plan and Parties .................................................................................... 3

   B.  The General Release and Covenant Not to Sue ........................................... 4

   C.  Defendants' Selection and Retention of Underperforming Investments Highlights Their
       Breaches of Fiduciary Duty .......................................................................... 4

III. LEGAL STANDARD .......................................................................................... 7

IV.  ARGUMENT ....................................................................................................... 9

   A.  Plaintiff has Article III Standing ................................................................. 9

      1. The General Release has no Effect on Plaintiff's Ability to Bring a Claim on Behalf of the
         Plan Under ERISA § 502(a)(2) ................................................................. 9

      2. Plaintiff's "Promise Not to Sue" does not Bar These Claims ...................... 9

      3. Any Redress Obtained by Plaintiff Would be Based on the Plan's Claims and
         Consequently is not Barred by the Clause Purporting to Prevent Plaintiff from Obtaining
         Relief ......................................................................................................... 9

   B.  Plaintiff Plausibly Alleges that Defendants Breached Their Fiduciary Duties by Retaining
       the Challenged Funds ................................................................................ 18

      1.  Plaintiff's Allegations that Defendants Retained the Challenged Funds Despite Indicia
          of Imprudence Creates an Inference of Imprudence ............................... 18

      2.  Plaintiff's Underperformance Allegations Support a Plausible Inference of Imprudence.
          .............................................................................................................. 23

         a. Plaintiff's Allegations Comparing the Challenged Funds to the Identified Benchmarks
            are Sufficient ...................................................................................... 27

         b. Plaintiff Shows More than Sufficient Evidence of the Sustained Underperformance of
            the Challenged Funds ......................................................................... 27

i. The MainStay Fund ............................................................................ 27

ii. The Janus Fund ............................................................................... 27

C.   Plaintiff Adequately Pleads Failure to Monitor and Knowing Participation in Breach of Trust Claims ..................................................................................... 30

V.   CONCLUSION ............................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anastos v. IKEA Property, Inc.*,
  526 F.Supp.3d 1353 (N.D. Ga. Mar. 17, 2021) ....................................................... 15

*Arnold v. Paredes*,
  --- F. Supp. 3d ----, 2024 WL 356751 (M.D. Tenn. Jan. 31, 2024) ........................ 11, 12, 13, 14

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................... 8

*Blackmon v. Zachry Holdings, Inc.*,
  2021 WL 2190907 (W.D. Tex. Apr. 22, 2021) .......................................................... 19

*Bowles v. Reade*,
  198 F.3d 752 (9th Cir. 1999) ............................................................................. 10, 14

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) .................................................................................... 25

*Burnett v. Prudent Fiduciary Services LLC*,
  2023 WL 387586 (D. Del. Jan. 25, 2023) .................................................................. 13

*Buster v. Compensation Comm. of Bd. of Directors of Mechanics Bank*,
  2017 WL 2999990 (N.D. Cal. July 14, 2017) ...................................................... 15, 16

*Castano v. American Tobacco Co.*,
  85 F.3d 734 (5th Cir. 1996) ...................................................................................... 17

*Cedeno v. Argent Trust Co.*,
  2021 WL 5087898 (S.D.N.Y. Nov. 2, 2021) ............................................................ 16

*Cedeno v. Sasson*,
  100 F.4th 386 (2d Cir. May 1, 2024) .................................................................. 11, 13

*Chavez v. Plan Benefit Services, Inc.*,
  2022 WL 1493605 (W.D. Tex. March 29, 2022) ........................................................ 8

*Cunningham v. Cornell Univ.*,
  2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) ......................................................... 24

*Cunningham v. Cornell Univ.*,
  2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019) .................................................... 27, 28

*Davis v. Wash. Univ. in St. Louis*,
    960 F.3d 478, 486 (8th Cir. 2020)...................................................................................8

*Doe No. 1 v. Knights of Columbus*,
    930 F. Supp. 2d 337 (D. Conn. 2013)..............................................................................8

*Festa v. Local 3 Int'l Brd. Of Elec. Workers*,
    905 F.2d 35 (2d Cir. 1990)...............................................................................................8

*Garcia v. Alticor, Inc.*,
    2021 WL 5537520 (W.D. Mich. Aug. 9, 2021) ........................................................22, 28

*Garthwait v. Eversource Energy Co.*,
    2021 WL 4441939 (D. Conn. Sept. 28, 2021)..................................................................9

*Garthwait v. Eversource Energy Co.*,
    2022 WL 1657469 (D. Conn. May 25, 2022)..................................................................12

*Gaubert v. United States*,
    885 F.2d 1284 (5th Cir. 1989)..........................................................................................7

*Goodman v. Columbus Regional Healthcare System, Inc.*,
    2022 WL 228764 (M.D. Ga. January 25, 2022) .............................................................22

*Hawkins v. Cintas Corp.*,
    32 F.4th 625 (6th Cir. 2022) .....................................................................................11, 16

*Henderson v. Emory Univ.*,
    252 F. Supp. 3d 1344 (N.D. Ga. 2017) ..........................................................................24

*Henry on behalf of BSC Ventures Holdings, Inc. Employee Stock Ownership Plan v. Wilmington Tr. NA*,
    72 F.4th 499 (3d Cir. 2023)............................................................................................11

*Hernandez v. Metro. Life Ins. Co.*,
    2019 WL 2563836 (W.D. Tex. Apr. 11, 2019).................................................................8

*Howell v. Motorola, Inc.*,
    633 F.3d 552 (7th Cir. 2011)..........................................................................................12

*Hughes v. Northwestern Univ.*,
    595 U.S. 170 (2022) .......................................................................................................20

*In re Biogen, Inc. ERISA Litig.*,
    2021 WL 3116331 (D. Mass. July 22, 2021).............................................................19, 20

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
   228 F.R.D. 541 (S.D. Tex. 2005) ................................................................ 13

*In re JDS Uniphase Corp. ERISA Litig.*,
   2006 WL 2597995 (N.D. Cal. Sept. 11, 2006) .......................................... 14

*In re LinkedIn ERISA Litig.*,
   2021 WL 5331448 (N.D. Cal. Nov. 16, 2021) .......................................... 19

*In re MedStar ERISA Litig.*,
   2021 WL 391701 (D. Md. Feb. 4, 2021) .................................................... 19

*In re: Prime Healthcare ERISA Litig.*,
   2021 WL 3076649 (C.D. Cal. July 16, 2021)............................................. 19

*In re Schering Plough Corp.*,
   589 F.3d 585 (3d Cir. 2009)....................................................................... 10

*Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*,
   892 F.3d 719 (5th Cir. 2018)......................................................................... 9

*IT Corp. v. Gen. Am. Life Ins. Co.*,
   107 F.3d 1415 (9th Cir.1997)...................................................................... 13

*Juliam v. City of Houston*,
   314 F.3d 721 (5th Cir. 2002)....................................................................... 17

*Kendall v. Pharm. Prod. Development, LLC*,
   2021 WL 1231415 (E.D.N.C. Mar. 31, 2021) .......................................... 29

*Kruger v. Novant Health, Inc.*,
   131 F. Supp. 3d 470 (M.D.N.C. 2015) ...................................................... 24

*LaRue v. DeWolff, Boberg & Associates, Inc.*,
   552 U.S. 248 (2008) ............................................................................ 16, 17

*Leavitt v. Nw. Bell Tel. Co.*,
   921 F.2d 160 (8th Cir. 1990)...................................................................... 13

*Leber v. Citigroup 401(k) Plan Inv. Comm.*,
   323 F.R.D. 145 (S.D.N.Y. 2017)................................................................ 11

*Littell v. Hous. Indep. Sch. Dist.*,
   894 F.3d 616 (5th Cir. 2018)......................................................................... 9

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ........................................................................... 8

*Main v. Am. Airlines Inc.,*
    248 F. Supp. 3d 786 (N.D. Tex. 2017) ............................................. 29

*Martin Operating P'ship v. United States,*
    119 F. Supp. 3d 566 (S.D. Tex. 2014) ............................................... 7

*Mass. Mut. Life Ins. Co. v. Russell,*
    473 U.S. 134 (1985) ......................................................................... 16

*Matassarin v. Lynch,*
    174 F.3d 549 (5th Cir.1999) ............................................................ 13

*Meiners v. Wells Fargo & Co.,*
    898 F.3d 820 (8th Cir. 2018) ........................................................... 22

*Mendiondo v. Centinela Hosp. Med. Ctr.,*
    521 F.3d 1097 (9th Cir. 2008) ........................................................... 8

*Mitsubishi Motor Corp. v. Soler Chrysler-Plymouth, Inc.,*
    473 U.S. 614 (1985) ......................................................................... 13

*Moler v. Univ. of Maryland Med. Sys.,*
    2022 WL 2756290 (D. Md. July 13, 2022) ...................................... 22

*Moreno v. Deutsche Bank Ams. Holding Corp.,*
    2017 WL 3868803 (S.D.N.Y. Sept. 5, 2017) ................................... 18

*Munro v. Univ. of Southern California,*
    896 F.3d 1088 (9th Cir. 2018) ......................................................... 10

*Owens v. Moore,*
    2020 WL 809377 (E.D. Va. Feb. 18, 2020) ....................................... 8

*Patterson v. Morgan Stanley,*
    2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) .................................... 22

*Pegram v. Herdrich,*
    530 U.S. 211 (2000) ........................................................................... 1

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.,*
    712 F.3d 705 (2d Cir. 2013) ........................................................ 9, 22

*Perkins v. United Surgical Partners Int'l, Inc.*,
    2024 WL 157434 (5th Cir. 2024)................................................................................ 23

*Pfahler v. Nat'l Latex Products Co.*,
    517 F.3d 816 (6th Cir. 2007)..................................................................................... 13

*Reighard v. Limbach Co., Inc.*,
    157 F. Supp. 2d 730 (E.D. Va. 2001) ...................................................................... 15

*Sacerdote v. New York Univ.*,
    2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) ......................................................... 25

*Sandoval v. Exela Enter. Sols., Inc.*,
    2020 WL 9259108 (D. Conn. Mar. 30, 2020)............................................................ 9

*Schapker v. Waddell & Reed Financial, Inc.*,
    2018 WL 1033277 (D. Kan. Feb. 22, 2018) ............................................................ 24

*Schweitzer v. Inv. Comm. of Phillips 66 Sav. Plan*,
    960 F.3d 190 (5th Cir. 2020)....................................................................................... 1

*Short v. Brown Univ.*,
    320 F. Supp. 3d 363 (D.R.I. 2018) .......................................................................... 24

*Smith v. CommonSpirit Health*,
    37 F.4th 1160 (6th Cir. 2022)................................................................................... 22

*Stanley v. George Washington Univ.*,
    394 F. Supp. 3d 97 (D.D.C. 2019) ........................................................................... 12

*Sullivan v. AT & T, Inc.*,
    2010 WL 905567 (N.D. Tex. March 12, 2010) ....................................................... 15

*Tatum v. RJR Pen. Inv. Comm.*,
    761 F.3d 346 (4th Cir. 2014).................................................................................... 22

*Terraza v. Safeway, Inc.*,
    241 F. Supp. 3d 1057 (N.D. Cal. 2017) .................................................................. 25

*Thole v. U.S. Bank N.A.*,
    140 S. Ct. 1615 (2020)................................................................................................ 7

*Tibble v. Edison Int'l*,
    575 U.S. 523 (2015) ........................................................................................... 18, 20

*Unite Here Retirement Fund v. City of San Jose*,
    2021 WL 292533 (N.D. Cal. Jan. 28, 2021) ............................................................ 8

*Waldner v. Natixis Inv. Managers, L.P.*,
    2021 WL 9038411 (D. Mass. Dec. 20, 2021) ........................................................ 25

*White v. Chevron Corp.*,
    2017 WL 2352137 (N.D. Cal. May 31, 2017) ........................................................ 22

*Wright v. Sw. Bell Tel. Co.*,
    925 F.2d 1288 (10th Cir. 1991) ............................................................................ 15

**Statutes**

29 U.S.C. § 1002(7) ...................................................................................................... 4

29 U.S.C. § 1102(a)(2) .................................................................................................. 4

29 U.S.C. § 1104(a)(1) .................................................................................................. 1

29 U.S.C. § 1104(a)(1)(B) ............................................................................................ 1

29 U.S.C. § 1132(a)(2) ................................................................................................ 11

**Rules**

Fed. R. Civ. P. 8(d)(2) ................................................................................................ 29

Fed. R. Civ. P. 12(b)(1) ................................................................................................ 7

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 8

## I.      INTRODUCTION

Plaintiff Manuel Esquivel ("Plaintiff"), individually and on behalf of the Whataburger Savings Plan f/k/a the Whataburger Profit Sharing and 401(k) Savings Plan (the "Plan"), respectfully submits this Memorandum of Law in opposition to Defendants' Motion to Dismiss the Complaint (ECF No. 23, the "Motion").[1]

The Employee Retirement Income Security Act ("ERISA") imposes strict fiduciary duties of loyalty and prudence upon retirement plan fiduciaries, which courts have recognized are "the highest known to the law."  *Schweitzer v. Inv. Comm. of Phillips 66 Sav. Plan*, 960 F.3d 190, 194 (5th Cir. 2020).  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), with an "eye single" to the interests of such participants and beneficiaries.  *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).  Fiduciaries must also exercise appropriate "care, skill, prudence, and diligence[.]"  29 U.S.C. § 1104(a)(1)(B).  In this case, Plaintiff claims Defendants breached the fiduciary duties they owe to the Plan by failing to appropriately monitor the Plan's investments and retaining imprudent investments in the Plan. To support these claims, Plaintiff pleads that Defendants were confronted with substantial red flags concerning the at-issue investments and failed to take remedial action consistent with their fiduciary duties.  Courts around the country have found that allegations of the kind set forth in detail in the Complaint state plausible breach of fiduciary duty claims under ERISA.  Yet, Defendants seek dismissal of Plaintiff's claims through self-serving distortions of the allegations in the Complaint and mischaracterizations of applicable law.

---

[1]"Defendants" or "Whataburger" refers collectively to Whataburger Restaurants, LLC, the Board of Directors of Whataburger Restaurants LLC, and the Whataburger 401(k) Savings Plan Administrative Committee.

*First*, Defendants seek to rely on a purported release and covenant not to sue to avoid facing Plaintiffs' claims on the merits.  Virtually every Court to consider whether an agreement related to the employment of an individual plan participant can impair derivative claims brought on behalf of a Plan under Section 502(a)(2) of ERISA, as Defendants put at issue in the Motion, has found that such an agreement does not preclude a Plan-wide action for breach of fiduciary duty.  Plaintiff has standing to bring—and the Court has subject matter jurisdiction to hear—the claims he asserts on behalf of the Plan and he is not prevented from receiving an allocation of any remedy the Plan receives.

*Second*, Defendants ignore Plaintiffs' well-pled allegations about the MainStay Winslow Large Cap Growth Fund ("MainStay Fund") and the Janus Henderson Triton Fund ("Janus Fund" and with the MainStay Fund, the "Challenged Funds").  Instead, Defendants resort to rhetoric designed to distract from the central inquiries the Court must make in resolving the Motion.  Headlining this effort, Defendants' cavils that their conduct cannot be imprudent because the Challenged Funds are only two of 19 investments in the Plan is wrong on the facts and the law.  It bears clarifying that the Plan only offered *10* investment options until 2020, *12* beginning in 2021, and *14* beginning only in 2022—the number trumpeted by Defendants includes investments offered at *any time* during the relevant period (including those that were terminated from the Plan).  Moreover, Defendants' fiduciary duty is not relaxed as to any of the Plan's investments just because other aspects of the Plan are not alleged to be imprudent in the same action.  Although Plaintiff is mindful of the competing obligations that fiduciaries face, the mere retention of some well-performing investments does not mean that Defendants have satisfied their fiduciary duties under ERISA.  Indeed, the retention of the Challenged Funds— both of which exhibited material concerns and lost a substantial amount of investment during the

same period—highlights Defendants' failure to take appropriate remedial action and supports a plausible inference that Defendants breached their fiduciary duties.

In their attempt to dodge Plaintiff's allegations regarding performance concerns with each of the Challenged Funds, Defendants desperately point to a few quarters in which the funds did not perform *as badly*.  This argument misses the point.  Exoneration by hindsight is no more appropriate than pleading a breach solely by hindsight and the isolated performance to which Defendants point does not undermine Plaintiff's allegations that the Challenged Funds consistently and substantially underperformed.  As the Complaint amply pleads, given the Challenged Funds' long history of failure along numerous relevant measures, prudent fiduciaries could not have formed a reasonable expectation that the Challenged Funds would perform in a manner sufficient to justify their retention in the Plan.  Unlike Plaintiff, whose allegations are based on data available to the Plan's fiduciaries in real-time, Defendants cherry-pick *post hoc* performance to fabricate a non-existent justification for retaining the Challenged Funds.  And critically, Defendants almost entirely fail to address Plaintiff's allegations concerning substantial capital flight from the Challenged Funds during the relevant period.  These allegations demonstrate that prudent investors were taking remedial action with respect to the Challenged Funds while Defendants failed to act.

The Motion provides no basis for dismissal and should be denied in its entirety.

## II.    BACKGROUND

### A.  The Plan and Parties

Plaintiff is a former employee of Whataburger and former participant in the Plan under 29 U.S.C. § 1002(7).  Compl., at ¶ 8.  During the Class Period, Plaintiff maintained an investment through the plan in each of the Challenged Funds, as well as other investments available through

3

the Plan.  *Id*.  Whataburger is the Plan sponsor and a named fiduciary under 29 U.S.C. §

1102(a)(2).  *Id*., at ¶ 10.  As of December 31, 2022, the Plan had 9,796 participants with account

balances and assets totaling approximately $215 million, placing it in the top 0.2% of all defined

contribution plans by total assets.  *Id*., at ¶ 3.

### B.  The General Release and Covenant Not to Sue

Plaintiff's employment at Whataburger concluded on March 3, 2023 and Plaintiff signed

the Severance Agreement on March 15, 2023.  *See* Compl., at ¶ 8; Defs.' Ex. A (Severance

Agreement).[2]  In connection with the Severance Agreement, Defendants provided a severance

payment, some funds for COBRA continuation, and a nominal additional payment.  *See* Defs.'

Ex. A, at 1.  In exchange, Plaintiff agreed to certain releases, non-disparagement and future

cooperation clauses, dispute resolution provisions, and other terms.  *See id.*  Relevant to the

Motion, Plaintiff agreed to a General Release, which purports to released Defendants from all

individual claims "of any type to date," brought on Plaintiff's own behalf or via a class action.

*See id.* at 2–3.  Plaintiff also agreed to a "Promise Not to Sue" provision, whereby Plaintiff

released his individual claims as per the General Release and Plaintiff promised not to sue for

those individual claims as well.  *Id.* at 3.  Notably, while the Severance Agreement refers to

individual ERISA claims in the General Release, at no point does it reference claims brought on

behalf of the Plan.  *Id.*  The same is true for future claims after the Agreement was signed.  *Id.*

### C.  Defendants' Selection and Retention of Underperforming Investments Highlights Their Breaches of Fiduciary Duty

Despite material concerns and substantial capital flight from the Challenged Funds,

Defendants retained the Challenged Funds in the Plan long past the point at which they could

support any reasonable expectation of performance sufficient to justify maintenance in the Plan.

---

[2] "Defs.' Ex." refer to Exhibits to Defendants' Motion.

4

*The MainStay Fund*.  The MainStay Fund demonstrated consistent and substantial underperformance throughout the relevant period.  *See* Compl., at ¶¶ 31–45.  Indeed, by the start of the Class Period, the MainStay had underperformed its stated benchmark (the Russell 1000 Growth Index) on three- and five-year bases for *nine consecutive quarters*.  *See id.*, at ¶ 32.  In addition, the fund's three- and five-year alpha—a measure of an investment's ability to add value in excess of its benchmark—was dramatically negative for each of those same periods.  *See id.* These are not short-term metrics influenced by sporadic or remote trends, but incorporate *over seven years* of data.  *See id.* (embedding chart).  These trends continued and the Complaint reviews that the MainStay Fund continued to trail its benchmark on three- and five-year bases and demonstrate substantial negative alpha measurements in the second, third, and fourth quarters of 2018.  *See* Compl., at ¶¶ 34–36.  Although the fund's three-year returns exhibited some modest improvement in 2019 and 2020, its five-year returns continued to trail its benchmark and five-year alpha remained negative.  *See* Compl., at ¶¶ 38–41.  In other words, the MainStay Fund's annualized five-year returns and alpha were negative for *sixteen consecutive quarters*.  *See* Compl., at ¶ 42.  The MainStay Fund was never an appropriate investment for the Plan during the Class Period and, at all times, suitable alternative investments were available for inclusion in the Plan.  *See* Compl., ¶ 43 (identifying suitable alternative investments). Defendants repeatedly overlooked the material concerns with the MainStay Fund even before the class period and decided to retain it despite its inability to support an expectation of returns sufficient to justify its retention in the Plan.  *See id.*, at ¶¶ 31–45.  Investors largely recognized and reacted to the MainStay Fund's concerns, as Morningstar's net asset flows to/from the MainStay Fund demonstrate a pattern of capital flight concurrent with the strategy's underperformance.  *See id.*, at ¶ 44.  At the end of 2014, the MainStay Fund had approximately

$20 billion in assets under management ("AUM"), but due in large part to net outflows well in excess of $1 billion per year, had approximately $11 billion in AUM as of the end of 2022. *See id.* Other investors monitoring the performance of the MainStay Fund were able to recognize the red flags associated with the fund and overwhelmingly withdrew their assets. *See id.*

**The Janus Fund.** The Janus Fund also demonstrated consistent and substantial underperformance throughout the relevant period. *See* Compl., at ¶¶ 46–58. In the first quarter of 2020, the Janus Fund's three-year return ranked in the 61st percentile among its peers and trailed the return of its benchmark by 2.00% annualized, its five-year return ranked in the 55th percentile among its peers and trailed its benchmark by 0.58% annualized, and its three- and five-year alpha were dramatically negative. *See id.*, at ¶ 47. The Janus Fund's performance against its peers and benchmark, as well as its alpha, remained negative for the ensuing two years. *See id.*, at ¶¶ 48–55. During this time, the Janus Fund fell below its benchmark by as much as *5.70%* annualized on a three-year basis (when it was in the *85th* percentile among peer funds according to this measure) and *3.17%* annualized on a five-year basis (when it was in the *77th* percentile among peer funds according to this measure).[3] *See id.*, at ¶ 53. Defendants ignored *eight consecutive quarters* of three- and five-year underperformance against the benchmark, three- and five-year returns that ranked in the bottom half (and at times in the bottom quartile) of small cap growth funds, and negative three- and five-year alphas. *See id.*, at ¶ 56. The fund's sharp and sustained decline in performance was neglected by Defendants who kept the fund in the plan lineup, despite poor performance versus its benchmark and abysmal peer rankings. *See id.*, at ¶¶ 46–58. Investors largely recognized and reacted to the Janus Fund's

---

[3]The three-year performance of the Janus Fund as of the prior quarter landed it in the 91st percentile among peer funds. *See* Compl., at ¶ 52.

consistently poor results, as Morningstar's net asset flows to/from the Janus Fund demonstrate a pattern of capital flight concurrent with the strategy's underperformance. *See id.*, at ¶ 56. The Janus Fund had approximately $12 billion in AUM in 2019, but due in large part to net outflows in excess of $1 billion per year, had approximately $7 billion in AUM as of the end of 2022. *See id.* Other investors monitoring the performance of the Janus Fund were able to recognize the red flags associated with the fund and overwhelmingly withdrew their assets. *See id.*

### III.    LEGAL STANDARD

In resolving the Motion under Rule 12(b)(1), the Court must take "[a]ny uncontroverted facts in the complaint . . . as true" and "construe the complaint broadly and liberally." *Martin Operating P'ship v. United States*, 119 F. Supp. 3d 566, 571 (S.D. Tex. 2014) (citing *Gaubert v. United States*, 885 F.2d 1284, 1285 (5th Cir.1989)). Specifically, to survive a standing challenge under Rule 12(b)(1), a plaintiff must establish: (1) he or she suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury was caused by the defendant; and (3) the injury would likely be redressed by the requested judicial relief. *See Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "At the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice' to show a viable injury, 'for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561. For class actions, there is a split within the Fifth Circuit regarding whether to evaluate the standing of the class via the proposed class representative alone or considering both the proposed class representative and the absent class members. *See Chavez v. Plan Benefit Services, Inc.*, 2022 WL 1493605 at *7 (W.D. Tex. March 29, 2022). This is of no

matter, however, as Defendants only challenge Plaintiff's standing on narrow grounds and each test is nonetheless met.

"'To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face.'" *Hernandez v. Metro. Life Ins. Co*., 2019 WL 2563836, at *1 (W.D. Tex. Apr. 11, 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "When deciding whether to grant a motion to dismiss, the court . . . must accept as true all 'well-pleaded factual allegations,'" and "construe the alleged facts in the light most favorable to the plaintiff. *Unite Here Retirement Fund v. City of San Jose*, 2021 WL 292533, at *2 (N.D. Cal. Jan. 28, 2021) (quoting *Mendiondo v. Centinela Hosp. Med. Ctr*., 521 F.3d 1097, 1104 (9th Cir. 2008)). A court's role "on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Doe No. 1 v. Knights of Columbus*, 930 F. Supp. 2d 337, 348 (D. Conn. 2013) (quoting *Festa v. Local 3 Int'l Brd. Of Elec. Workers*, 905 F.2d 35, 37 (2d Cir. 1990)); *see also Owens v. Moore*, 2020 WL 809377, at *1 (E.D. Va. Feb. 18, 2020). "Significantly, a complaint may proceed even if recovery is very remote and unlikely, so long as the alleged facts raise a right to relief above the speculative level." *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 622 (5th Cir. 2018).

It is well understood in the context of ERISA claims that "plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences," thus requiring them to utilize the information available to them, such as evidence of investment options retained in the face of information suggesting their unsuitability, from which the court may be able to "reasonably 'infer from what is alleged that the process was flawed.'" *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.* ("*PBGC*"), 712 F.3d 705, 718 (2d Cir. 2013) (quotation omitted);

*accord Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*, 892

F.3d 719, 728 (5th Cir. 2018) (citing cases).  A plaintiff's claim for breach of fiduciary duty may

"survive at the motion to dismiss stage 'if the complaint alleges facts that, if proved, would show

that an adequate investigation would have revealed to a reasonable fiduciary that the investment

issue was imprudent.'"  *Garthwait v. Eversource Energy Co.*, 2021 WL 4441939, at *4 (D.

Conn. Sept. 28, 2021) (quoting *PBGC*, 712 F.3d at 718).  A breach of fiduciary claim is sufficient

if the facts alleged demonstrate that a "prudent fiduciary in like circumstances would have acted

differently."  *Sandoval v. Exela Enter. Sols., Inc.*, 2020 WL 9259108, at *2 (D. Conn. Mar. 30,

2020) (citation omitted).

## IV.   ARGUMENT

### A.   Plaintiff has Article III Standing

Defendants first argue the Court lacks subject matter jurisdiction because Plaintiff signed

a severance agreement that includes a purported release and covenant not to sue, which

Defendants contend deprives Plaintiff of Article III standing to bring this lawsuit.  *See* Mot., at

7–10.  Since actions under Section 502(a)(2) of ERISA are brought in a derivative capacity on

behalf of a plan as a whole, courts around the country have routinely found that individual

agreements related to employment cannot impair a participant's right to bring an action on behalf

of a plan.  Consistent with the well-reasoned approach taken by a majority of courts considering

the issue, the Court has subject matter jurisdiction and should reject Defendants' argument.

#### 1.   The General Release has no Effect on Plaintiff's Ability to Bring a Claim on Behalf of the Plan Under ERISA § 502(a)(2)

Defendants argue that Plaintiff lacks standing because the General Release specifically

bars ERISA claims.  They fail to acknowledge, however, that most courts to consider the issue

have found that an individual release (even one that purports to generally release ERISA claims)

9

is ineffective to release breach of fiduciary duty claims brought on behalf of a plan under Section 502(a)(2) of ERISA. *See In re Schering Plough Corp.*, 589 F.3d 585, 594 (3d Cir. 2009) ("The vast majority of courts have concluded that an individual release has no effect on an individual's ability to bring a claim on behalf of an ERISA plan under § 502(a)(2).").

In fact, courts have found that agreements of various kinds signed by individual participants in a retirement plan do not preclude them from bringing suit on behalf of a plan. *See Munro v. Univ. of Southern California*, 896 F.3d 1088 (9th Cir. 2018). In *Munro*, the Ninth Circuit affirmed denial of a motion to compel arbitration of plan-wide breach of fiduciary duty claims based on an arbitration agreement in employment contracts signed by individual participants in the plan. *See id.*, at 1090. The Ninth Circuit held, consistent with established precedent, that ERISA breach of fiduciary duty claims seeking plan-wide relief may not be impaired by agreements with individual participants. *See Munro*, 896 F.3d at 1093 (citing *Bowles v. Reade*, 198 F.3d 752, 760 (9th Cir. 1999)). Similarly, the Sixth Circuit recently found that "[a]lthough § 502(a)(2) claims are brought by individual plaintiffs, it is the plan that takes legal claim to the recovery, suggesting that the claim really 'belongs' to the Plan." *Hawkins v. Cintas Corp.*, 32 F.4th 625, 632–33 (6th Cir. 2022). In *Hawkins*, the Sixth Circuit held that, "because § 502(a)(2) claims 'belong' to the Plan, an arbitration agreement that binds only individual participants cannot bring such claims into arbitration." *Id.* At least one subsequent court has held that the Sixth Circuit's reasoning in *Hawkins* applies to release agreements. *See Arnold v. Paredes*, --- F. Supp. 3d ----, 2024 WL 356751, at *7 (M.D. Tenn. Jan. 31, 2024); *see also Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 161 (S.D.N.Y. 2017) (collecting cases) ("In cases brought on behalf of a plan, most courts have held that 'individuals do not have the authority to release a defined contribution plan's right to recover for breaches of

fiduciary duty'; the consent of the plan is required for a release of 29 U.S.C. § 1132(a)(2) claims."). Likewise, the Second and Third Circuits each recently held that provisions of an employment agreement purporting to prospectively waive a participant's right to seek remedies on behalf of a retirement plan are unenforceable. *See Henry on behalf of BSC Ventures Holdings, Inc. Employee Stock Ownership Plan v. Wilmington Tr. NA*, 72 F.4th 499, 507–08 (3d Cir. 2023); *accord Cedeno v. Sasson*, 100 F.4th 386, 400 (2d Cir. May 1, 2024).

Contrary to the weight of authority, Defendants stake their argument on *Chaplin v. NationsCredit Corp.*, erroneously drawing a parallel between seven plaintiffs, *each* of whom signed a general release, and the class members at issue here. *See* Mot., at 8. While *Chaplin* demonstrates some willingness by the Fifth Circuit to strictly enforce release provisions, it only so held for individuals seeking recovery on their own behalf. Plaintiff's claims are on behalf of the Plan, and therefore Defendants' analyses are irrelevant.

Furthermore, Defendants cite *Stanley v. George Washington Univ.*, referring to its instructional value as an example of a similar claim being dismissed. *See* Mot., at 8–9 (citing *Stanley v. George Washington Univ.*, 394 F. Supp. 3d 97 (D.D.C. 2019), *aff'd*, 801 F. App'x 792 (D.C. Cir. 2020)). While Defendants claim that *Stanley* is decided "under virtually identical circumstances," they grossly exaggerate its relevance. *See* Mot., at 8. The plaintiff in *Stanley* argued that her ERISA claim for was vested benefits and the court, thus, had no occasion to address whether she had the power to waive claims brought derivatively on behalf of the plan. *See* 394 F. Supp. 3d at 107; *see also Arnold*, --- F. Supp. 3d ----, 2024 WL 356751, at *7 (distinguishing *Stanley*); *Garthwait v. Eversource Energy Co.*, 2022 WL 1657469, at *14 (D.

Conn. May 25, 2022) (same).[4]  This is because claims for vested benefits under ERISA are individual claims typically brought under Section 502(a)(1) of ERISA.  *See Stanley*, 394 F. Supp. 3d at 103 (explaining that "[s]uits under ERISA sections 502(a)(2) and (a)(3) are meaningfully distinct from those brought via section 502(a)(1)(B)" because, "while section 502(a)(2) suits are brought in a representative capacity, so that recovery runs to the plan, section 502(a)(1)(B) remedies 'run[ ] directly to the injured [participant or] beneficiary.'").  Just as the plaintiff in *Stanley* did, Defendants ignore the derivative nature of breach of fiduciary duty claims brought on behalf of a plan—for the same reasons, Defendants' argument does not hold water.[5]

On the contrary, courts in the Fifth Circuit and others across the country recognize that claims brought on behalf of plans under ERISA Section 502(a)(2) are derivative in nature.  *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 228 F.R.D. 541, 556 (S.D. Tex. 2005) (quoting *Matassarin v. Lynch*, 174 F.3d 549 (5th Cir.1999)) (allowing plan participants to sue for breach of fiduciary duty under ERISA Section 502(a)(2) for the plan as a whole); *Arnold*, --- F. Supp. 3d ----, 2024 WL 356751, at *5 (noting the plaintiffs had standing despite a general release as "the fact that Plaintiffs have explicitly brought their claims under ERISA §§ 502(a)(2) and (a)(3) is another sign that they intended to bring their claims on behalf of the plan."); *Cedeno*, 100 F.4th at 394 (finding that because plaintiff's means of relief was via a plan-wide remedy, contractual provisions can be held unenforceable).

---

[4]Presumably, the plaintiff in *Stanley* argued that her suit was one for vested benefits in order to suggest it fell within a carveout in the release at issue in her case for "claims for vested benefits." *See* 394 F. Supp. 3d at 107.  Still, whatever the reason, the court did not consider or address whether her action could be brought consistent with the principles discussed here.  *See id.*

[5]Defendant's other authority for this point is inapt for the same reasons.  *See* Mot., at 9 (citing *Howell v. Motorola, Inc.*, 633 F.3d 552 (7th Cir. 2011)).  Indeed, courts have refused to apply *Howell* since it does not address whether a plaintiff may waive claims brought derivatively on behalf of a plan.  *See Arnold*, --- F. Supp. 3d ----, 2024 WL 356751, at *7 (distinguishing *Howell*); *Garthwait v. Eversource Energy Co.*, 2022 WL 1657469, at *14 (same).

Defendants' authorities ignore that Plaintiff's claims are brought on behalf of the plan rather than Plaintiff as an individual.  When an individual brings a claim under 502(a)(2) of ERISA on behalf of the plan, courts generally do not view individual general releases as bars to standing.  Maintaining that claims brought on behalf of a plan belong to the plan itself and cannot be released by an individual is a matter of sound public policy.

Defendants also make a public policy argument about the good of enforcing releases in the abstract.  *See* Mot., at 7–8.  Again, Defendants base their arguments without regard to the specific nature of an ERISA class action suit.  Generally, courts have ruled that general releases preventing the right to purse a remedy provided by ERISA to be *against* public policy.[6]  *See, e.g.*, *Pfahler v. Nat'l Latex Products Co.*, 517 F.3d 816, 836–37 (6th Cir. 2007) (quoting *Leavitt v. Nw. Bell Tel. Co.*, 921 F.2d 160, 161 (8th Cir. 1990)); *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1418–19 (9th Cir.1997); *Arnold*, --- F. Supp. 3d ----, 2024 WL 356751, at *11.  Courts usually uphold a plaintiff's ability to bring about a class action suit on behalf of a plan without a single release preventing relief for the entire class.  As a public good, there is clear sense to this policy maintaining that fiduciary duty for an entire plan is not so easily stripped away.  As such, under both statutory interpretations by this circuit and others as well as for public policy reasons, dismissal is not warranted.

### 2.   Plaintiff's "Promise Not to Sue" does not Bar These Claims

Likewise, Defendants argue that the Severance Agreement's "Promise Not to Sue"

---

[6]This is also the case for arbitration clauses preventing the same.  *See Burnett v. Prudent Fiduciary Services LLC*, 2023 WL 387586, at *4 (D. Del. Jan. 25, 2023) (citing *Mitsubishi Motor Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985)) ("not only does the FAA not require courts to enforce an agreement to waive a substantive remedy, but such an agreement will usually be held invalid as against public policy.").

13

invalidates Plaintiff's standing.  Although Defendants are correct in distinguishing the covenant

not to sue from a release, they are similarly incorrect in its effect on Plaintiff's ability to bring his

claims on behalf of the Plan, and therefore, his standing.  Defendants again oversimplify and

mistake the analysis, conflating the covenant's general effect with specific effect on prospective

derivative claims on behalf of a Plan under ERISA.

As with release agreements, courts have found that covenants not to sue do not preclude

actions brought on behalf of a plan under Section 502(a)(2) of ERISA.  *See In re JDS Uniphase*

*Corp. ERISA Litig.*, 2006 WL 2597995, at *1–2 (N.D. Cal. Sept. 11, 2006) (citing *Bowles v.*

*Reade*, 198 F.3d 752, 759–61 (9th Cir. 1999)).[7]  Even more specifically, courts in several circuits

have held that covenants not to sue are not effective as to unknown, future ERISA claims.  There

is an important distinction of known ERISA rights versus any future violations that Defendants

overlook.  Waivers of known rights, often obtained via settlement agreement as is the case here,

do not generally usher or cause future violations.  Conversely, "a covenant not to sue purports to

waive prospectively any future rights or claims under ERISA, the result, in effect, is to grant the

employer a license to violate ERISA in the future with impunity. ERISA rights are too important

to permit this result."  *Reighard v. Limbach Co., Inc.*, 157 F. Supp. 2d 730, 733 (E.D. Va. 2001);

*see also Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1293 (10th Cir. 1991) (covenant not to sue

and release could not have constituted a knowing and voluntary waiver of right to sue under

ERISA where, at the time the release was signed, the plaintiff had not yet asserted his ERISA

---

[7]While the court in *JDS Uniphase* stylized the agreement at issue as a release, it is clear from the
language of the agreement set forth in the court's order that it was considering a release and
covenant not to sue.  *See*  2006 WL 2597995, at *1 (reviewing agreement stating, "you
completely release from and ***agree not to file, cause to be filed, or otherwise pursue*** against the
company . . . ." (emphasis added)).

claim and it was impossible for either side to know of the future claim).[8]  Similarly, the Fifth

Circuit has distinguished between a covenant waiving an individual's known rights versus future

unknowns.  *See Sullivan v. AT & T, Inc.*, 2010 WL 905567, at *4 (N.D. Tex. March 12, 2010)

(refusing to dismiss the plaintiff's ERISA claim as it was unknown on the date when the Waiver

was executed and confirming that "[a]lthough a waiver may release known claims, it cannot

release future, unknown claims.").[9]  The "Promise Not to Sue" does not strip Plaintiff of standing

or otherwise warrant dismissal.

### 3.  Any Redress Obtained by Plaintiff Would be Based on the Plan's Claims and Consequently is not Barred by the Clause Purporting to Prevent Plaintiff from Obtaining Relief

Just as Plaintiff brings his claims on behalf of the Plan, so too does he seek relief in the

same manner.  Defendants argue that Plaintiff has not suffered a redressable injury in fact

because he gave up his right to recover relief, *see* Mot., at 9–10, and therefore, he lacks standing

as there is no injury that is redressable to him.  *See id.*  Defendants, however, again ignore the

fact that Plaintiff's claims are brought on behalf of the Plan and the nature and structure of relief

that could be obtained as a result of this action.

The Supreme Court has recognized that ERISA breach of fiduciary duty claims are

appropriately brought in a representative capacity on behalf of a plan and Congress did not

intend for ERISA's provisions establishing liability for breaches of fiduciary duty to "authorize

---

[8]Other courts have recognized that federal authority, albeit limited, "suggests that releases of prospective ERISA claims may be prohibited as violating public policy."  *Anastos v. IKEA Property, Inc.*, 526 F.Supp.3d 1353 (N.D. Ga. Mar. 17, 2021).

[9]Defendants suggest that Plaintiff has breached an agreement by filing the complaint, *see* Mot., at 9, courts have declined to find a breach of contract under these circumstances.  *See Buster v. Compensation Comm. of Bd. of Directors of Mechanics Bank*, 2017 WL 2999990, at *13 (N.D. Cal. July 14, 2017) (defendant did not demonstrate that covenant not to sue would be valid to waive plaintiffs prospective right to sue for ERISA violations).

any relief except for the plan itself." *See Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 145 (1985). Indeed, ERISA does not provide for individual remedies; the only instance in which a remedy may appear individual in nature is when the extent the portion of a plan's injury attributable to an individual participant's account is coextensive with the plan's entire injury. *See LaRue v. DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248, 256 (2008) (finding that ERISA Section 502(a)(2) provides remedies to a plan indistinct from those to an individual); *cf. Cedeno v. Argent Trust Co.* 2021 WL 5087898, at *4 n.2 (S.D.N.Y. Nov. 2, 2021), *aff'd sub nom. Cedeno v. Sasson*, 100 F.4th 386 (2d Cir. 2024) (confirming *LaRue* "did not imply that a participant who suffered losses in an account in a defined contribution plan could not seek plan-wide relief").[10]

It is important to note that relief sought on behalf of a plan in an ERISA claim differs from many other types of remedies made available to other claims mentioned in the Severance Agreement. For instance, the general release also covers discrimination claims under the Age Discrimination in Employment Act of 1967 (ADEA) for which relief is solely individualized. *See Juliam v. City of Houston*, 314 F.3d 721, 728 (5th Cir. 2002) ("[a] primary remedial purpose of the ADEA is to make the individual victim of discrimination whole."). This makes sense. For a discrimination claim, an individual brings the claim on behalf of his or herself. Even for class action discrimination cases, there is no unifying plan for which to seek relief, rather each individual receives their percentage of a settlement or damages payment. The same is true of negligence claims, another form of action specifically identified in the Severance Agreement. While multiple employees could suffer the harm resulting from a defendant's negligence, for

---

[10]As is the case with courts refusing to uphold certain arbitration clauses due to general releases of claims, so too have they overlooked arbitration clauses that pertain to relief. *See e.g.*, *Hawkins v. Cintas Corp.*, 32 F.4th 625, 634 (6th Cir. 2022) (deciding that because Cintas' fiduciary breaches do not impact the each of the many plaintiffs solely as an individual, the harm and so too the recovery is to the Plan).

example poor air quality in an office, the relief is nonetheless individualized.  *See*, *e.g.*, *Castano v. American Tobacco Co.*, 85 F.3d 734 (5th Cir. 1996) (plaintiffs bringing class action seeking equitable and individualized relief).  The unique nature of an ERISA class action claim differs from other forms of action identified in the Severance Agreement, as Plaintiff seeks relief on behalf of the plan consistent with ERISA's remedial scheme.

Defendants' position regarding Plaintiff's ability to recover in an action on behalf of a Plan is at odds with well-established principles of remedies in actions under Section 502(a)(2) of ERISA, pursuant to which any relief would necessarily flow to the Plan and Plaintiff's allocation of any such relief as a result of his participation in the Plan is incidental to the remedy that may be awarded by the Court.  As Judge Schofield of the Southern District of New York, relying on the Supreme Court's opinion in *LaRue*, explained:

> Thus any monetary recovery is awarded to the Plan, not the participants. *See LaRue*, 552 U.S. at 262 n.* (Thomas, J. concurring) ("[A] participant suing to recover benefits on behalf of the plan is not entitled to monetary relief payable directly to him; rather, any recovery must be paid to the plan."); *L.I. Head Start* [*Child Dev. Servs., Inc. v. Econ. Oppt'y Comm'n of Nassau Cty., Inc.*], 710 F.3d [57,] 66 [(2d Cir. 2013)] ("[T]he fact that damages awarded to the Plan may provide plaintiffs with an indirect benefit . . . does not convert their derivative suit into an action for individual relief." (internal quotation marks omitted)).

*Moreno v. Deutsche Bank Ams. Holding Corp.*, 2017 WL 3868803, at *3 (S.D.N.Y. Sept. 5, 2017).  The provision cited by Defendants should not be read to prevent Plaintiff from receiving an allocation of the relief accorded to the Plan pursuant to the terms of the Plan and ERISA's remedial scheme in the event of a successful recovery in a Plan-wide action under ERISA.

*         *         *

Plaintiff has Article III standing—and, thus, the Court has subject matter jurisdiction— because both the claim and relief sought are asserted on behalf of the Plan.  Defendants' arguments that the General Release, Promise Not to Sue, and provision that Plaintiff released

individual future relief within the Severance Agreement completely neglect ERISA's statutory design and well-established principles preventing the enforcement of those provisions on the terms urged by Defendants.

### B. Plaintiff Plausibly Alleges that Defendants Breached Their Fiduciary Duties by Retaining the Challenged Funds

Plaintiff states plausible claims that Defendants imprudently retained the Challenged Funds in the face of material concerns with the investments and evidence that prudent investors were divesting. *See* Compl., at ¶¶ 31–58. ERISA fiduciaries have "a continuing duty to monitor trust investments and remove imprudent ones," which "exists separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments at the outset." *Tibble v. Edison Int'l*, 575 U.S. 523, 529–30 (2015) ("A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones."). Plaintiff plausibly alleges Defendants' fiduciary investment monitoring fell short. In seeking dismissal under Rule 12(b)(6), Defendants misrepresent the nature and degree of underperformance exhibited by the Challenged Funds on annualized bases over relevant periods, the comparators pled by Plaintiffs, and additional indicia of imprudence associated with the Challenged Funds. Reduced to their essence, Defendants' arguments raise issues that may be appropriate to take up after discovery, but none of these issues warrant dismissal.

### 1. Plaintiff's Allegations that Defendants Retained the Challenged Funds Despite Indicia of Imprudence Creates an Inference of Imprudence

First, Defendants suggest that retention of the Challenged Funds could not have been imprudent since "investors held billions of dollars" in the funds. Mot., at 12–13. Defendants, however, fail to meaningfully contend with material allegations that the Challenged Funds were hemorrhaging assets as investors rapidly withdrew their funds. *See* Compl., at ¶¶ 44, 56. Courts have found that allegations of "noticeable outflows of funds" from an investment vehicle support

claims that retirement plan fiduciaries breached their duty by retaining that investment.  *In re MedStar ERISA Litig.*, 2021 WL 391701, at *2–3, 6 (D. Md. Feb. 4, 2021); *see also In re LinkedIn ERISA Litig.*, 2021 WL 5331448, at *7 (N.D. Cal. Nov. 16, 2021) (same); *In re: Prime Healthcare ERISA Litig.*, 2021 WL 3076649, at *4 (C.D. Cal. July 16, 2021) (same); *Blackmon v. Zachry Holdings, Inc.*, 2021 WL 2190907, at *4 (W.D. Tex. Apr. 22, 2021).  Indeed, allegations of capital flight in the wake of performance concerns "support a plausible claim that a prudent person who knew what Defendants knew" would have divested from the Challenged Funds.  *In re Biogen, Inc. ERISA Litig.*, 2021 WL 3116331, at *6 (D. Mass. July 22, 2021).

While it is true that, in 2022, the Challenged Funds retained between $7 billion and $11 billion, respectively, this unadorned fact does not address that MainStay Fund experienced net capital outflows of approximately ***45%*** (*i.e.*, a reduction from $20 billion to $11 billion) from 2014 to 2022, *see* Compl., at ¶ 44 (embedding chart), and the Janus Fund experienced net capital outflows of over ***40%*** in just ***three years*** (*i.e.*, a reduction from $12 billion to $7 billion).  *See* Compl., at ¶ 56.  As the Complaint pleads, these substantial capital outflows coincide with material performance concerns in each of the Challenged Funds and demonstrate that prudent investors were taking appropriate remedial action and divesting.  *See* Compl., at ¶¶ 44, 56.  Clearly, Defendants ignored the significant net outflows from both the MainStay Fund and the Janus Fund, sticking their heads in the sand as other prudent investors recognized both funds' concerns and responded appropriately.  *See, e.g.*, *Biogen*, 2021 WL 3116331, at *6.

Second, Defendants suggest it is "axiomatic" that Plaintiff cannot plead a breach of fiduciary duty simply because he challenges Defendant's retention of only two of the Plan's investment options.  *See* Mot., at 13.  This flies in the face of recent Supreme Court authority

which rejects the reasoning that assembling a large menu insulates fiduciaries from claims that

they breached their duty by retaining certain unsuitable investments:

> In rejecting petitioners' allegations, the Seventh Circuit did not apply *Tibble*'s guidance. Instead, the Seventh Circuit focused on another component of the duty of prudence: a fiduciary's obligation to assemble a diverse menu of options. The court determined that respondents had provided an adequate array of choices, including "the types of funds plaintiffs wanted (low-cost index funds)." 953 F.3d at 991. In the court's view, these offerings "eliminat[ed] any claim that plan participants were forced to stomach an unappetizing menu." *Ibid.*
>
> The Seventh Circuit erred in relying on the participants' ultimate choice over their investments to excuse allegedly imprudent decisions by respondents. In *Tibble*, this Court explained that, even in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options. *See* 575 U.S. at 529–530 []. ***If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty.*** *See ibid.*

*See Hughes v. Northwestern Univ.*, 595 U.S. 170, 175–77 (2022) (emphasis added).  In addition,

as introduced above, Defendants' assertion that Plaintiff challenges two of 19 investments in the

Plan is a hyperbolic attempt to minimize Plaintiff's allegations.  The Plan only offered ***10***

investment options until 2020, ***12*** beginning in 2021, and ***14*** beginning only in 2022.  *See* Defs.

Ex. B.  For the majority of the relevant period, the Plan offered ***fewer than 12***—not 19—

investments.  *See id.*  Indeed, until the first quarter of 2022, when Defendants selected a suite of

target date funds[11] for the Plan, the Plan menu included no multi-asset investment alternative,

leaving participants to construct their own portfolios from the limited single-asset class

alternatives available.  This highlights the importance of prudently monitoring each of the single-

asset class alternatives in the Plan, like the Challenged Funds.[12]  Even if Defendants' argument

---

[11]"Target date funds" are asset allocation products that provide investors with portfolios diversified among a pre-selected mix of investments.

[12]Given the absence of an asset allocation investment alternative for a substantial portion of the relevant period during which Defendants imprudently retained the Challenged Funds, the

was persuasive on the law (it is not), the argument would fail on the fact that Plaintiff actually challenges **two of 10** or **12** investment alternatives, each with a substantial amount of Plan assets.

Third, in a similarly misguided attempt to downplay the obvious underperformance of the Challenged Funds, Defendants argue "nothing in ERISA 'requires a fiduciary to pick the best performing fund.'" Mot., at 14. This is not the standard to which Plaintiff seeks to hold Defendants. Rather, Plaintiff pleads that Defendants breached their fiduciary duties by failing to react to indicia of imprudence that would have been apparent to them in real time when they retained the Challenged Funds in the Plan. The Complaint's allegations of Defendants' egregious and sustained failure to respond to prolonged periods of concern with and capital flight from the Challenged Funds are sufficient to survive a motion to dismiss. In *Moler*, the United States District Court for the District of Maryland focused on underperformance for three funds over a five-year period and persuasively explained that focusing upon "[t]he investments' long-term underperformance is categorically different than showing what a fiduciary should have done in hindsight." *Moler v. Univ. of Maryland Med. Sys.*, 2022 WL 2756290, at *4–5 (D. Md. July 13, 2022) (citing *Goodman v. Columbus Regional Healthcare System, Inc.*, 2022 WL 228764, at *2 (M.D. Ga. January 25, 2022)). As the *Moler* court explained, "Plaintiffs' allegation is not that Defendants should have acted differently in hindsight; but rather that Defendants were aware of the funds' underperformance at the time and chose to ignore it." *Id*. (citation omitted); *see also Garcia v. Alticor, Inc.*, 2021 WL 5537520, at *7 (W.D. Mich. Aug. 9,

---

MainStay Fund and the Janus Fund represented participants' only avenue to allocate a portion of their retirement savings to domestic large cap growth equities and domestic small cap growth equities, respectively. The Court should give little credence to Defendants' incorrect and ineffective attempt to argue that Plaintiff complains about only a small fraction of the investments available for selection through the Plan, as Plaintiff's claims pertain to Defendants' misconduct depriving participants of the ability to gain direct exposure to those market segments through investment in a prudent product, either before or after the addition of target date funds.

2021) (rejecting defendant's similar hindsight argument and finding "plaintiffs bring allegations that the committee failed for years to perform sufficient reviews or investigations into the Plan's performance[;] [t]hus, it is plausible that Defendants had access to performance data at various points throughout the relevant period, and Plaintiffs' allegation is that Defendants did not adequately consider that information; [and] [i]f this allegation is true, it is a breach of ERISA."); *Tatum v. RJR Pen. Inv. Comm.*, 761 F.3d 346, 360 (4th Cir. 2014) ("By conducting no investigation, analysis, or review of the circumstances surrounding the divestment, RJR acted with procedural imprudence no matter what level of scrutiny is applied to its actions.").[13]  Thus, it is more than plausible that Defendants had access to performance data at various points throughout the Class Period, and, as in *Garcia*, Plaintiff's "allegation is that Defendants did not adequately consider that information" and "[i]f this allegation is true, it is a breach of ERISA." *Garcia v. Alticor, Inc.*, 2021 WL 5537520, at * 7.[14]

Defendants cherry-pick authorities in support of their misguided argument, relying heavily on *Locasio v. Fluor Corp.*, but stripping away the context.  Mot., at 15 (citing 2023 WL 320000, at 6 (N.D. Tex. Jan. 18, 2023)).  But the *Locascio* court itself acknowledged that *some* courts have analyzed particular benchmarks when their context-specific inquiries benefited from such analysis, but it does not find that one is required in *all* circumstances.  *Id.*  Nor do the court's suggestions as to what might be evidence of a meaningful benchmark establish a

---

[13]The court in *Moler* also persuasively distinguished the Sixth Circuit Court of Appeals' outlier decision in *Smith v. CommonSpirit Health*, 37 F.4th 1160 (6th Cir. 2022).  *See* 2022 WL 2756290, at *5.

[14]The cases cited by Defendants are readily distinguishable on this basis.  *See White v. Chevron Corp.*, 2017 WL 2352137, at *20 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453, 455 (9th Cir. 2018); *St. Vincent Catholic Med. Ctr. v. Morgan Stanley*, 712 F.3d 705, 718 (2d Cir. 2013); *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018); *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *17 (S.D.N.Y. Oct. 7, 2019); *Smith*, 37 F.4th at 1166.

requirement to make certain showings in *every* situation.  Rather, the *Locascio* court emphasized that the "crux" of fiduciary breach pleadings is that plaintiffs must do more than "simply labeling languages as 'comparable'"—which *may* be achieved by identifying certain characteristics of benchmarks.  *Id.*  This premise aligns with the well-settled pleading standard that Defendants try to ignore: the "context-specific inquiry" performed by courts will vary across unique fact patterns and will dictate what, in any given case, constitutes a "meaningful benchmark" (or whether, for that matter, one would be useful).  Since *Fluor* was decided, the Fifth Circuit has reversed overly rigid applications of ERISA's pleading standard, *see Perkins v. United Surgical Partners Int'l, Inc.*, 2024 WL 157434, at *2–4 (5th Cir. 2024),[15] and other federal courts in Texas have sustained similar breach of fiduciary duty claims.  *See Laliberte v. Quanta Servs., Inc.*, No. 4:22-cv-03290, ECF No. 53 (S.D. Tex. Sept. 29, 2023).

## 2. Plaintiff's Underperformance Allegations Support a Plausible Inference of Imprudence

### a. Plaintiff's Allegations Comparing the Challenged Funds to the Identified Benchmarks are Sufficient

As an initial matter, Defendants' argument that Plaintiff fails to offer meaningful comparators in the face of his allegations comparing the Challenged Funds to their designated benchmarks the "raises factual questions that are not properly addressed on a motion to dismiss." *Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *7 (S.D.N.Y. Sept. 29, 2017); *see Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 478 (M.D.N.C. 2015) (noting that the defendants' argument that the "comparison to Vanguard Fund fees is inapt . . . [but] these arguments are better resolved at a later stage of the proceedings"); *accord Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1352 (N.D. Ga. 2017) ("the proper benchmark can be more appropriately

---

[15]Plaintiffs note the Fifth Circuit's opinion in *Perkins* was not selected for publication.

determined on summary judgment"); *Schapker v. Waddell & Reed Financial, Inc.*, 2018 WL 1033277, at *8 (D. Kan. Feb. 22, 2018) ("the question whether the funds Plaintiff presents are comparable is a question of fact that the Court will not resolve in the context of ruling on a motion to dismiss"); *Short v. Brown Univ.*, 320 F. Supp. 3d 363, 372 (D.R.I. 2018) ("To the extent Brown suggests otherwise, or presents different benchmarks to measure the Plans' performance, it raises factual issues that cannot be decided at the pleading stage").

Still, even if the Court resolves issues concerning the appropriateness of Plaintiff's comparators, it should find them sufficient. Plaintiff's performance allegations compare the Challenged Funds to the very benchmarks selected by the funds' own investment managers. *See* Compl., at ¶¶ 31 (identifying Russell 1000 Growth Index as benchmark for MainStay Fund), 46 (identifying Russell 2500 Growth Index as benchmark for Janus Fund). Given the structure and goals of actively managed investments, which are designed to add excess return compared to a given benchmark, it is inarguably appropriate to compare the Challenged Funds to their manager-designated benchmarks.[16] *See id.*, at ¶ 22. Indeed, numerous courts have held that allegations that challenged investments have consistently failed to outperform their benchmarks suffice to state a claim for breach of fiduciary duty under ERISA. *See, e.g.*, *Waldner v. Natixis Inv. Managers, L.P.*, 2021 WL 9038411, at *3–4 (D. Mass. Dec. 20, 2021) (denying motion to dismiss complaint that alleged imprudence of investments based on underperformance compared to prospectus benchmark and other available investment options); *Terraza v. Safeway, Inc.*, 241 F. Supp. 3d 1057, 1076 (N.D. Cal. 2017) (denying motion to dismiss complaint that alleged investment options underperformed compared to their benchmark); *Braden v. Wal-Mart Stores,*

---

[16]This is consistent with prevailing standards around investment policy statements, which typically call for actively managed investments to be evaluated against index benchmarks (often the benchmark identified in a fund's prospectus).

*Inc.*, 588 F.3d 585, 596–97 (8th Cir. 2009) (refusing to dismiss complaint where plaintiff alleged that defendants "did not change the options included in the Plan despite the fact that most of them underperformed the market indices they were designed to track"); *Sacerdote v. New York Univ.*, 2017 WL 3701482, at *10 (S.D.N.Y. Aug. 25, 2017) ("allegations that [defendant] breached its fiduciary duty by offering actively managed funds that did not have a 'realistic expectation of higher returns' also plausibly support a prudence claim at this stage").

Defendants misunderstand Plaintiff's allegations concerning the availability of suitable alternative investments for the Challenged Funds during the relevant period. *Compare* Mot., at 9–22 *with* Compl., at ¶¶ 43, 57. Put simply, Plaintiff pleads the availability of several alternative investments, including both passive and active funds, in order to demonstrate that prudent fiduciaries who resolved to replace the Challenged Funds when confronted with their red flags could (and would) have readily done so, irrespective of preferences concerning investment approach. *See* Compl., at ¶¶ 43, 57. With respect to the passive alternative investments, Defendants do not contest that the investments offered the opportunity to track the performance of the benchmark designated by the managers of the respective Challenged Funds. *See id.* Likewise, Defendants entirely ignore that the active alternative investments identified in are each within the same Morningstar categories as the respective Challenged Funds.[17] *See id.* This is the

---

[17]Morningstar's categories classify funds into peer groups based on their holdings over the past three years; Morningstar therefore expects funds within the same category "invest in similar types of securities and therefore share the same risk factors" and "can, in general, be expected to behave more similarly to one another than to portfolios outside the category." *See* https://awgmain.morningstar.com/webhelp/glossary_definitions/mutual_fund/glossary_mf_ce_M orningstar_Category.html. It is similarly unsurprising that the portfolios of the suitable alternative investments identified by Plaintiffs have different holdings, as two different investments will not have the *exact same* investment allocations—if they did, there would be no need to choose between different funds in the same investment classification. Thus, Plaintiff identified funds which in the same asset classes grouping by Morningstar.

initial screen applied by virtually all investment advisors when performing a search for a replacement investment.  Plaintiff offers these alternatives as examples of readily available suitable alternatives, not to independently establish the Challenged Funds' underperformance.  It is of no moment that these alternatives have different designated benchmarks, as the Morningstar classification assigned based on *actual holdings* is the relevant determinant for this purpose.

Defendants' criticisms of each alternative investment similar do not hold water.  For the MainStay Fund, Defendants complain the JPMorgan fund has a different strategy implementation and that the Fidelity fund's managers use a different benchmark index.  Concerning the former, it is unremarkable to suggest that distinct investment products take distinct approaches at providing value in the same area of the market, otherwise all large cap growth funds, for example, would be identical.  Regarding the latter, it is not relevant to the Fidelity fund's availability as another large cap growth alternative that the Fidelity managers have selected a different benchmark.  Actively managed funds attempt to both outpace peers operating in the same sphere as well as their chosen benchmark index.[18]  The benchmark selected by the fund's manager indicates the aggregated performance of the market they would like to be measured against; the peers who execute a similar fund style are also the competitors against which they will be measured.

Defendants misrepresent Plaintiff's reasoning for including the Wasatch Fund and the Putnam Fund as alternatives to the Janus Fund by omitting from their explanation that "the three-

---

[18]Benchmarks offer a measure of how well an investment is performing in its chosen segment of the market, and demonstrate the performance available to an investor if they merely chose to invest in an index fund tracking the benchmark instead; peer groups offer perspective on how other investment choices operating similar, not identical, strategies in the same segment of the market are performing.  Both comparative tools provide a glimpse at the opportunity cost of choosing a particular investment.

and five-year returns of both funds never failed to . . . rank in the top half of the relevant *peer group*." Complaint ¶ 57 (emphasis added). That the Wasatch Fund and Putnam Fund's managers respectively chose a different index benchmark than the managers of the Janus Fund does not render them incomparable when both are included in the Complaint as examples of other funds classified by Morningstar (which is based not on what type of fund the investment managers *want* to be judged as, but what type of fund an investment *is based on its portfolio holdings*) as small cap growth that were available for investment during the relevant period. Defendants attempt to distract from the poor performance of the Janus Fund by pointing out that it outperformed a different benchmark than the one its managers chose to be evaluated against over two cherry picked data points as of the end of 2020 and 2021, without addressing the fact that the Janus Fund dramatically underperformed *its own benchmark and the broad peer group* as of the end of 2020 and 2021. *See* Compl., at ¶¶ 50, 55.

Finally, Defendants' authorities for the suggestion that "some similarities" are insufficient to plead a meaningful benchmark refer to investments that offer exposure to more than one asset class, and thus are not analogous to domestic large cap growth funds or domestic small cap growth funds: target date funds, which by their nature are multi-asset investment vehicles, and an equity fund with sufficient domestic and international stock exposures such that it is "a one-stop shop for those investors who want broad exposure to both domestic and international equities." *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 486 (8th Cir. 2020).

### b. Plaintiff Shows More than Sufficient Evidence of the Sustained Underperformance of the Challenged Funds

Repeatedly, Defendants attempt to paint the *prolonged* underperformance of both the MainStay and Janus Funds as merely "some small, intermittent performance fluctuations when compared to a few other funds in the market." *See, e.g.*, Mot., at 4, 22–24. This characterization

is inaccurate.  Plaintiff pleads that Defendants had access to data in real time demonstrating—quarter after quarter—serious concerns with the Challenged Funds.

### i.  The MainStay Fund

As already detailed, the MainStay Fund experienced lengthy periods of substantial underperformance against the very benchmark selected by its mangers.  *See supra* II.C.  Still, Defendants falsely asset that Plaintiff "never alleges" the MainStay Fund "underperformed by more than 1.00%."  *See* Mot., at 22 (emphasis removed).  But Plaintiff alleges that the MainStay Fund underperformed its benchmark by as much as ***2.44%*** on a three-year basis and ***4.03%*** on a five-year basis from 2016 through 2018, the very data that Defendants had or should have had to support its decision making with respect to the MainStay Fund at the beginning of the Class Period.  *See* Compl., at ¶ 32 (embedding chart).  In addition, Defendants contend the MainStay fund outperformed its benchmark in 2019 and 2020.  *See* Mot., at 22.  Yet, the MainStay Fund had negative 5-year returns compared to its benchmark for ***every*** quarter during 2019 and 2020.  *See* Compl., at ¶ 38.  After a brief period of stronger three-year returns, the MainStay Fund has not outperformed its benchmark since the first quarter of 2021, to say nothing of its substantial capital outflows during this period (which Defendants ignore except for a single footnote in which they feebly waive it away).

The three- and five- review periods for which Plaintiff asserts allegations of underperformance and negative alpha are the periods recognized by investment professionals as the most important for evaluating investment returns.  *See Cunningham v. Cornell Univ.*, 2019 WL 4735876, at *13 (S.D.N.Y. Sept. 27, 2019) (finding an advisor satisfied its fiduciary duty when it regularly presented "three and five-year benchmarks" of investment options).  Prudent fiduciaries would have observed the apparent concerns with the MainStay Fund, as well as the

clear loss of investor confidence in the fund, and taken appropriate remedial action.  Thus, Defendants assertion that Plaintiff is "not able to plead consistent underperformance for the MainStay Fund" is simply false.

### ii.   The Janus Fund

Similarly, despite Defendants' glaring omissions, the Janus Fund experienced lengthy periods of substantial underperformance against the very benchmark selected by its mangers. *See supra* II.C.  As an example of their self-serving presentation of data, Defendants claim that the five-year return of the Janus Fund merely trailed its benchmark by 0.58% in the first quarter of 2020, but omit that the fund's 3-year returns *also* underperformed the benchmark by 2.00% in that same quarter.  *See* Compl., at ¶ 47.  It is also disingenuous to suggest, as Defendants do, that the Janus Fund only underperformed "during the volatility of the pandemic," *see* Mot., at 29, given its underperformance over a more sustained period.  *See* Compl., at ¶¶ 47–55.  Likewise, despite Defendants' suggestion that Plaintiff does not identify a single year where more than one of the plans investment options underperformed its benchmark, *see* Mot., at 29, in 2020, both the three- and five- year returns of the Janus Fund underperformed the benchmark, and the five-year returns of the MainStay Fund underperformed their benchmark.  *See* Compl., at ¶¶ 38, 47–50. Clearly, Plaintiff does not merely point to "small" or "intermittent fluctuations" in the performance of the MainStay Fund or the Janus Fund, but rather, highlights a pattern of long-term *sustained* issues with the Challenged Funds.  *See Cunningham*, 2019 WL 4735876, at *13.

Plaintiff does contend that isolated and insubstantial concerns with an investment would support an inference of prudence, but prudent fiduciaries in Defendants' position would have appropriately considered the red flags exhibited by the Challenged Funds and taken remedial action.  If Defendants had carried out their roles as fiduciaries in a prudent manner, they would

have considered the data available to them ***at the time*** of their retention of the Challenged Funds. *See Garcia v. Alticor, Inc.*, 2021 WL 5537520, at *7 (W.D. Mich. Aug. 9, 2021) ("it is plausible that Defendants had access to performance data at various points throughout the relevant period, and Plaintiff's allegation is that Defendant did not adequately consider that information; [and] [i]f this allegation is true, it is a breach of ERISA."). Indeed, when confronted with sustained performance concerns and capital outflows, prudent fiduciaries recognize the need to investigate whether the expected future performance of the fund can support retention in a plan. *See Kendall v. Pharm. Prod. Development, LLC*, 2021 WL 1231415, at *3 (E.D.N.C. Mar. 31, 2021) ("An adequate investigation of existing investments considers whether any of the plan's investments are 'improvident' or if a 'superior alternative investment' exists."). Defendants acted imprudently in failing to investigate and consequently retaining the Challenged Funds.

### C. Plaintiff Adequately Pleads Failure to Monitor and Knowing Participation in Breach of Trust Claims

Since Plaintiff states claims that certain fiduciaries breached their duties to the Plan, and Defendants were responsible for monitoring those fiduciaries, Plaintiff plausibly alleges Defendants failed to fulfill their monitoring duties. *See Main v. Am. Airlines Inc.*, 248 F. Supp. 3d 786, 795 (N.D. Tex. 2017) (citing cases). As for the alternative participation claim, this alternative claim only applies to any Defendant that is not deemed a fiduciary. Rule 8(d)(2) permits such alternative pleading. *See* Fed. R. Civ. P. 8(d)(2). Defendants also argue that both the duty to monitor and alternative participation claims should be dismissed because no primary breach claim survives. As discussed above, Plaintiff adequately pleads the primary fiduciary breach claims and dismissal of these derivative claims is unwarranted.

### V.   CONCLUSION

The Court should deny the Motion in its entirety.

Dated: June 1, 2024

Respectfully submitted,

/s/ *Alec J. Berin*
James C. Shah
Alec J. Berin
MILLER SHAH LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
        ajberin@millershah.com

James E. Miller
Laurie Rubinow
MILLER SHAH LLP
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
        lrubinow@millershah.com

John S. "Jack" Edwards, Jr.
Texas Bar No. 24040851
Thomas R. Ajamie
Texas Bar No. 00952400
Eric Chenoweth
Texas Bar No. 24006989
AJAMIE LLP
Pennzoil Place - South Tower
711 Louisiana, Suite 2150
Houston, TX 77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
Email: jedwards@ajamie.com
        tajamie@ajamie.com
        echenoweth@ajamie.com

Don Bivens
DON BIVENS PLLC
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone: (602) 708-1450
Email: don@donbivens.com

*Attorneys for Plaintiff, the Plan,
and the Proposed Class*

**CERTIFICATE OF SERVICE**

I, Alec J. Berin, hereby certify that the foregoing document was electronically filed and

served on all counsel of record by operation of the Court's CM/ECF system on this date.


Dated: July 1, 2024                                     /s/ *Alec J. Berin*
                                                        Alec J. Berin