**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| Manuel Esquivel, individually and as a representative of a class of similarly situated persons, on behalf of the WHATABURGER 401(k) SAVINGS PLAN (f/k/a the Whataburger Profit Sharing and 401(k) Savings Plan), | Case No. 5:24-cv-310-XR |
| Plaintiff, | |
| v. | |
| WHATABURGER RESTAURANTS LLC; THE BOARD OF DIRECTORS OF WHATABURGER RESTAURANTS LLC; THE WHATABURGER 401(K) SAVINGS PLAN ADMINISTRATIVE COMMITTEE (f/k/a the Whataburger Profit Sharing and 401(k) Savings Plan Administrative Committee); and DOES No. 1–20, Whose Names Are Currently Unknown, | <u>**ORAL ARGUMENT REQUESTED**</u> |
| Defendants. | |

**DEFENDANTS' REPLY IN SUPPORT OF ITS
<u>MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 3

I.      RULE 12(B)(1) REQUIRES DISMISSAL BECAUSE PLAINTIFF LACKS
        STANDING ............................................................................................................. 3

        A.      Plaintiff Has Released the Claims in This Lawsuit ................................. 3

        B.      Plaintiff's Promise Not to Sue Bars This Lawsuit .................................. 4

        C.      Plaintiff Fails to Identify How He Can Redress Any Injury in Light of
                Agreeing to Waive a Right to Recovery .................................................. 7

II.     RULE 12(B)(6) REQUIRES DISMISSAL BECAUSE PLAINTIFF FAILED TO
        STATE A CLAIM FOR FIDUCIARY BREACH UNDER ERISA. ............................... 8

        A.      A Context-Specific Inquiry Shows That Plaintiff's Limited Performance-
                Based Allegations Do Not Create an Inference of Imprudence ............................ 8

                1.      Plaintiff's Performance-Based Allegations Do Note State a Claim ........ 10

                2.      Plaintiff Has Failed to Provide Meaningful Benchmarks ...................... 11

                3.      Plaintiff's Allegations of Short-Term, Intermittent, and Modest
                        Underperformance Are Insufficient to State a Claim ............................ 15

        B.      Because Plaintiff's Prudence Claim Fails, So Too Do His Derivative
                Claims .................................................................................................... 17

III.    CONCLUSION ......................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bekker v. Neuberger Berman Grp. LLC*,
  2018 WL 4636841 (S.D.N.Y. Sept. 27, 2018)..........................................................................16

*BP Expl. & Prod., Inc. v. Claimant Id 100281817*,
  919 F.3d 284 (5th Cir. 2019) ....................................................................... *passim*

*Cho v. Prudential Ins. Co. of Am.*,
  2021 WL 4438186 (D.N.J. Sept. 27, 2021) ..........................................................................16

*Coyer v. Univar Sols. USA Inc.*,
  2022 WL 4534791 (N.D. Ill. Sept. 28, 2022) ........................................................................10

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008)....................................................................................12, 14, 15

*Davis v. Wash. U. in St. Louis*,
  960 F.3d 478 (8th Cir. 2020) .....................................................................11, 12, 14

*Forman v. TriHealth, Inc.*,
  563 F. Supp. 3d 764 (S.D. Ohio 2021) ...............................................................................16

*Howell v. Motorola, Inc.*,
  633 F.3d 552 (7th Cir. 2011) ...................................................................................4

*Hughes v. Nw. U.*,
  595 U.S. 170 (2022)......................................................................................2, 8

*In re JDS Uniphase Corp. ERISA Litig.*,
  2006 WL 2597995 (N.D. Cal. Sept. 11, 2006) ......................................................................5

*Kirschbaum v. Reliant Energy, Inc.*,
  526 F.3d 243 (5th Cir. 2008) ...................................................................................8

*Locascio v. Fluor Corp.*,
  2023 WL 320000 (N.D. Tex. Jan. 18, 2023) .....................................................6, 8, 11, 14, 17

*Matney v. Barrick Gold of N.A.*,
  80 F.4th 1136 (10th Cir. 2023) .............................................................................9, 11

*Meiners v. Wells Fargo & Co.*,
  898 F.3d 820 (8th Cir. 2018) .................................................................................13

*Nat'l Am. Ins. Co. v. Melancon*,
1999 WL 600372 (E.D. La. Aug. 9, 1999) ............................................................5

*Perkins v. United Surgical Partners Int'l, Inc.*,
2024 WL 1574342 (5th Cir. Apr. 11, 2024) ...................................................13, 14

*Reighard v. Limbach Co., Inc.*,
158 F. Supp. 2d 730 (E.D. Va. 2001) ................................................................6

*Smith v. CommonSpirit*,
37 F.4th 1160 (6th Cir. 2022) ............................................................... *passim*

*Stanley v. Geo. Wash. U.*,
394 F. Supp. 3d 97 (D.D.C. 2019), *aff'd*, 801 F. App'x 792 (D.C. Cir. 2020)
(unpublished) ...........................................................................................3, 4

*Sullivan v. AT & T, Inc.*,
2010 WL 905567 (N.D. Tex. March 12, 2010) ...................................................6

*Thole v. U.S. Bank N.A.*,
590 U.S. 538 (2020)...........................................................................................7

*Washington v. Occidental Chem. Corp.*,
24 F. Supp. 2d 713 (S.D. Tex. 1998) .................................................................6

*White v. Chevron Corp.*,
2016 WL 4502808 (N.D. Cal. 2016) ..................................................................9

*White v. Chevron Corp.*,
752 F. App'x 453 (9th Cir. 2018) ...............................................................11, 15

## INTRODUCTION[1]

Whataburger's opening brief established ERISA breach of fiduciary duty claims are "context-specific" and the context here does not give rise to a plausible claim that Whataburger imprudently monitored the Plan's investments for three independent reasons. First, as a matter of law, the mere allegation that particular investments underperformed does not state a fiduciary breach claim under ERISA. Plaintiff has alleged nothing more, and that is reason enough to dismiss the Complaint in its entirety. Second, Plaintiff does not even offer a meaningful benchmark from which the Court can plausibly conclude that the challenged investments underperformed. Third, it is implausible to infer Whataburger's fiduciary *process* was imprudent given that Plaintiff alleges that just two of the Plan's funds allegedly had intermittent, brief periods of modest underperformance during a six-year period.

Plaintiff's opposition brief confirms that a "context-specific" inquiry requires dismissal. He admits that Whataburger made frequent changes to the Plan investment lineup (Opp. at 2, 20), added target date funds to the Plan (*id.* at 20), and that an overwhelming majority of the funds in the Plan performed well at all times during the putative class period (*id.*). These allegations belly an inference of imprudence. He further admits that at no point during the putative class period did more than one fund in the Plan—which at any time had between ten and fourteen funds in its investment lineup—underperform its prospectus benchmark as measured on a three-year average (one of Plaintiff's two preferred measurements). *Id.* at 29. Still, Plaintiff asks the Court to infer Whataburger had an imprudent investment process despite no criticisms of the actual investment monitoring process Whataburger used. *Id.* at 8. Looking at the context of the Plan as a whole, as

---

[1] Terms defined in Whataburger's Motion to Dismiss (ECF No. 23, "Mot.") have the same meaning here. Plaintiff's Response in Opposition (ECF No. 25, "Opp.") is referred to as the "Opposition."

the Court must do, it is not plausible to infer Whataburger acted outside "the range of reasonable judgments a fiduciary may make." *Hughes v. Nw. U.*, 595 U.S. 170, 177 (2022).

But the Court need not even decide whether Plaintiff has stated a plausible claim under ERISA because he lacks standing to bring this lawsuit. Plaintiff's Opposition confirms as much. Indeed, Plaintiff does not contest that he knowingly and voluntarily signed a Severance Agreement containing (a) a release, (b) a separate covenant not to sue, and (c) a waiver of "all rights to money" or other relief based on "any judicial decision," including "class" action rulings. Instead, he seeks to have his cake (the $26,000+ in severance) and eat it too by arguing that the Severance Agreement does not cover claims "on behalf of the Plan." This is a red herring. The release bars the Complaint because Plaintiff explicitly agreed to release claims "on behalf of another person or entity," which here includes the Plan. To the extent Plaintiff had the right to bring a claim and seek damages, he also had the right—and did—release and waive it. The Fifth Circuit favors the enforcement of releases in these circumstances, Mot. at 2, and the out-of-circuit case law cited by Plaintiff does not alter that conclusion. Plaintiff's covenant not to sue Whataburger "in court"— either on his behalf or on behalf of any other entity—separately bars the Complaint.

Plaintiff's primary retort is that he cannot agree to waive "prospective claims." But Plaintiff only challenges conduct that occurred *prior* to signing the covenant; his claims are not "prospective." Lastly, while Plaintiff agrees that the Severance Agreement prevents him from obtaining any individual relief, he argues that he can still share in any recovery by the Plan. This circular argument is unsupported by case law and reads out the explicit language of the Severance Agreement, which provides that Plaintiff gave up "all rights to any money" or other relief based on "any judicial decision." Regardless of the Plan's recovery, Plaintiff himself has not suffered an injury that is redressable to him. Mot. at 9–10 (citing *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540

(2020)). The release, the covenant not to sue, and the waiver of any right to recover or receive damages each independently bar this Plaintiff from bringing this lawsuit.

For any and all of the reasons cited above, the Court should dismiss this case with prejudice.

## ARGUMENT

## I.    RULE 12(B)(1) REQUIRES DISMISSAL BECAUSE PLAINTIFF LACKS STANDING

Plaintiff does not dispute that he bears the burden of establishing standing for his lawsuit to survive. *See* Mot. at 7; Opp. at 9–18. For three independent reasons, Plaintiff has failed to meet his burden.

### A.    Plaintiff Has Released the Claims in This Lawsuit

Plaintiff does not contest that he knowingly and voluntarily entered into the release or that his ERISA claims fall within the subject matter of the release. His only retort is that because he is suing "on behalf of the Plan," the release cannot apply. Plaintiff ignores, however, that he specifically agreed not to bring a claim "on behalf of another person or entity," i.e., the Plan. Mot. at 2. None of the out-of-circuit cases cited by Plaintiff address the circumstance here where Plaintiff agreed to waive his right to bring claims on behalf of the Plan.

And contrary to Plaintiff's argument, ERISA does not prohibit releases from waiving a participant's right to bring claims on behalf of the plan. *See Stanley v. Geo. Wash. U.*, 394 F. Supp. 3d 97, 105 (D.D.C. 2019), *aff'd*, 801 F. App'x 792 (D.C. Cir. 2020) (unpublished). Plaintiff argues that Stanley was a claim for "vested benefits" under ERISA § 502(a)(1) and the court had "no occasion to address whether she had the power to waive claims derivatively on behalf of the plan." (Opp. at 11–12). That is flatly wrong. In *Stanley*, the plaintiff brought "fiduciary breach claims brought *on behalf* of the plan," under ERISA § 502(a)(2) and (a)(3)—just like Plaintiff here. 394 F. Supp. at 110, n.10 ("By contrast, claims under section 502(a)(2), like those Stanley brings here,

are not described as claims under, pursuant to, or as authorized by, employee benefit plans. Rather, such claims typically are described as fiduciary breach claims brought on behalf of the plan and under ERISA."). The plaintiff in *Stanley* argued that his claims fell within an *exclusion* in the release for "vested benefits under employee benefit plans," but the court correctly rejected that conclusion. *Id.* It went onto hold that Plaintiff's fiduciary breach claims "brought on behalf of the Plan" fell within the "general provisions of the release" and were therefore "waived." *Id.* at 111. This Court should reach the same conclusion here. *See also Howell v. Motorola, Inc.*, 633 F.3d 552, 560 (7th Cir. 2011) (same).

In short, if Plaintiff has the right to bring a lawsuit on behalf of the Plan, has the right to lose (or win) a lawsuit on behalf of the Plan, and has the right to voluntarily dismiss a lawsuit brought on behalf of the Plan, then he also can release his right to bring a claim a claim on behalf of the Plan. And that is what he did here.

**B.**     **Plaintiff's Promise Not to Sue Bars This Lawsuit**

Separately, Plaintiff lacks standing because he entered into a "Promise Not to Sue" Whataburger "in Court," barring this lawsuit. Plaintiff makes two primary arguments in response: that (1) his claims are brought "on behalf of the Plan," and (2) he cannot waive prospective claims. Each argument is without merit.

*First*, contract law governs the interpretation of severance agreements, and the Court therefore "must read the Agreement's provisions as whole . . . giving effect to all its terms 'without rendering any of them meaningless or superfluous.'" *BP Expl. & Prod., Inc. v. Claimant Id 100281817*, 919 F.3d 284, 288 n.2 (5th Cir. 2019). As set forth in the Severance Agreement, the Promise Not to Sue is "different from the General Release." Mot. at 5. Plaintiff agrees, conceding that "Defendants are correct in distinguishing the covenant not to sue from a release." Opp. at 14.

Yet Plaintiff interprets the Promise Not to Sue to have the same effect (or lack thereof) as the release, impermissibly rendering it meaningless.

Plaintiff also tries to treat the two different provisions of the Severance Agreement as one by leaning on case law that addressed releases—not covenants to sue. He argues "courts have found that covenants not to sue do not preclude actions brought on behalf of a plan," but he cites only a single out-of-circuit district court opinion—and that opinion does not support Plaintiff's assertion. Opp. at 14. In *In re JDS Uniphase Corp. ERISA Litigation*, the release and covenant not to sue were, by the terms of the agreement itself, one and the same, and the court therefore provided no analysis specific to the covenant not to sue. *See In re JDS Uniphase Corp. ERISA Litig., 2006 WL 2597995, at *1–2 (N.D. Cal. Sept. 11, 2006)* (the provision at issue stated that "you completely release from and agree not to file, cause to be filed, or otherwise pursue against the company . . . any and all claims you may now have or have ever had against the Company"). Plaintiff's lack of authority makes it clear: covenants not to sue can preclude a plaintiff's right to file a lawsuit on behalf of the Plan, particularly in the Fifth Circuit, where "covenant not to sue preserves the cause of action" and a "release destroys it." *See Nat'l Am. Ins. Co. v. Melancon, 1999 WL 600372, at *3 (E.D. La. Aug. 9, 1999)*. A covenant not to sue merely determines *who* can (or cannot) bring a claim on behalf of the Plan; it does not destroy that cause of action. Plaintiff's agreement not to "sue" Whataburger "in court" either on his behalf or on behalf of any other entity precludes him from bringing the Complaint here.[2]

---

[2] Plaintiff claims that preventing him from bringing this lawsuit would encourage fiduciary misconduct. Opp. at 13. Not so. First, this concern is inapplicable to a covenant not to sue: thousands of other putative class members without a covenant not to sue could have brought this lawsuit but they did not. Second, that is an argument against enforcing any releases ever; in the same way, one could argue that preventing employees from suing under Title VII would "encourage" employers to discriminate. But, of course, releases covering Title VII claims are enforced all the time.

Plaintiff next argues that the Promise Not To Sue is unenforceable because he cannot agree to waive "future violations." Opp. at 14–15. This argument misses the point: Plaintiff lacks standing because his allegations are about events that occurred *prior* to when he signed the Severance Agreement on March 15, 2023. The cases Plaintiff cites demonstrate that prospective waivers come into play when events occur after the signing of an agreement. *See, e.g.*, *Sullivan v. AT & T, Inc.*, 2010 WL 905567, at *4 (N.D. Tex. March 12, 2010) (finding plaintiff can bring a claim for an alleged misrepresentation that occurred "more than four years *after* he executed the waiver") (emphasis added); *Reighard v. Limbach Co., Inc.*, 158 F. Supp. 2d 730, 731 (E.D. Va. 2001) (covenant not to sue in January 2000 employment agreement did not preclude claim about wrongful termination in October 2000). Here, Plaintiff has agreed not to sue about conduct occurring prior to March 15, 2023—but that is all his Complaint covers. *See, e.g.*, Compl. ¶¶ 46–56 (Janus Fund allegedly underperformed between 2020 to 2021; "Had the Committee met to appropriately review the Plan's investment results as of the end of the Fourth Quarter of 2021. . . ."); Compl. ¶¶ 32–41 (MainStay Fund allegedly underperformed in 2018 and 2019; "Had the Committee met to appropriately review the Plan's investment results as of the end of the Fourth Quarter of 2019. . . .").[3] Indeed, Plaintiff has not even met his burden of establishing that he was in the Plan after March 15, 2023 or held either of these investments after that date—which would mean he lacked standing to challenge those funds after that date. *See* Compl. ¶ 8 (alleging he is a "former participant in the Plan"); *Washington v. Occidental Chem. Corp.*, 24 F. Supp. 2d 713, 729 (S.D. Tex. 1998) (ERISA's "protections are limited to participants, beneficiaries, and fiduciaries of the employee benefit plan at issue"); *Locascio v. Fluor Corp.*, 2023 WL 320000, at *3 (N.D.

---

[3] Or, alternatively, if the Complaint is stripped away of the allegations occurring prior to March 15, 2023, Plaintiff has failed to state a claim.

Tex. Jan. 18, 2023) ("Locascio suffered no injury, and therefore has no standing, because she invested in none of the twelve options of the Plan.").

### C. Plaintiff Fails to Identify How He Can Redress Any Injury in Light of Agreeing to Waive a Right to Recovery

Finally, Whataburger's opening brief explained that Plaintiff cannot meet his burden under Article III that he suffered an injury that can be "redressed by a favorable ruling." Mot. at 7, 9–10 (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733–34 (2008)). That is so because Plaintiff waived his right to obtain money or other relief "based on any agency or judicial decision, including class or collective action rulings." *Id*. at 9.

Plaintiff's response is circular, and unsupported by any case law. Importantly, Plaintiff does not dispute that recovery is a prerequisite to have Article III standing. Plaintiff further admits that he cannot recover any money or other relief "directly" under the Severance Agreement. But Plaintiff argues that he can obtain an "allocation of relief accorded to the Plan," and "any such relief as a result of his participation in the Plan is incidental to the remedy that may be awarded by the Court." Opp. at 26. "Incidental" or not, the Severance Agreement is clear: Plaintiff gave up "*all rights* to *any money* or other individual relief based on *any* [] *judicial decision*, including class or collective action rulings." Nowhere is there an exclusion for monies obtained via a "portion of the Plan's injury," and the Court must "give effect" to the express terms of the Severance Agreement. *BP Expl. & Prod., Inc.*, 919 F.3d 288 n.2. Plaintiff himself has "no concrete stake in this lawsuit," *Thole*, 590 U.S. at 544, and he lacks Article III standing as a result.

## II.   RULE 12(B)(6) REQUIRES DISMISSAL BECAUSE PLAINTIFF FAILED TO STATE A CLAIM FOR FIDUCIARY BREACH UNDER ERISA.

### A.   A Context-Specific Inquiry Shows That Plaintiff's Limited Performance-Based Allegations Do Not Create an Inference of Imprudence

As Whataburger's opening brief established, and Plaintiff does not contest, to state a claim under ERISA, Plaintiff must create a plausible inference that Whataburger acted outside "the range of reasonable judgments a fiduciary may make." *Hughes*, 595 U.S. at 177. To make this assessment, the Court must view the allegations "as a whole" and apply a "context-specific inquiry." *Id.* at 177–78. Against this framework, Plaintiff has not created a plausible inference of imprudence for three reasons: (1) allegations of mere underperformance are insufficient to infer an imprudent process, yet that is all Plaintiff has done here; (2) Plaintiff has not alleged any meaningful benchmarks for the two challenged funds against which performance could even be measured; and (3) the inconsistent, insubstantial underperformance Plaintiff alleges is insufficient to create a plausible inference of fiduciary misconduct.

Viewing the Complaint as a whole, Plaintiff's opposition brief underscores how few "indicia of imprudence" he alleges and how large of a leap he is asking the Court to make to infer imprudence. Opp. at 18, 21. All his Complaint alleges is that two commonly held investments (of the seventeen in the Plan at various times) allegedly underperformed for portions of the relevant time period by a small amount. That a fund or two underperformed over a six-year period is unremarkable, if not to be expected, in a portfolio of investments that are intended to cover the "long-term horizon." *See Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 253-54 (5th Cir. 2008); *see also Locascio*, 2023 WL 320000, at *1 ("Sometimes stocks underperform."). Indeed, the Complaint alleges that more than *ninety percent* of actively managed funds in the market underperform their benchmark over the long term, Compl. ¶ 26 n.4, yet simultaneously acknowledges there is nothing imprudent about offering actively managed funds. *Id.* ¶ 26 ("This

is not to suggest that active management is inappropriate for use in a retirement plan lineup."). So complaining that two actively managed funds in the Plan allegedly underperformed cannot be a basis for inferring an imprudent fiduciary process; otherwise, that would allow an "inference" of imprudence anytime fiduciaries offered any of those 90+ percent of actively managed funds. And Plaintiff here alleges nothing to explain how Whataburger's investment monitoring process could lead to a lineup mostly consisting of objectively prudent investments and yet that same process imprudently led to the retention of the two challenged funds.[4]

To avoid this context, Plaintiff accuses Whataburger of a "hyperbolic attempt to minimize Plaintiff's allegations" because at various points in time the Plan had ten, twelve, or fourteen investments, not nineteen investments at one time. Opp. at 20. This misses the point. That there was ten to fourteen funds at any given time does not change the fact that Plaintiff only identified two about which he had performance concerns. Plaintiff's response, moreover, refutes any inference that the Plan's fiduciaries were not paying attention: it added and removed investments throughout the putative class period and changed the size of the Plan investment lineup, including adding target date funds. It is implausible that the watchman was asleep at the switch when he is routinely flipping it. *See, e.g.*, *White v. Chevron Corp.*, 2016 WL 4502808, at *11 (N.D. Cal. 2016) ("[T]he allegations in the complaint show that the Plan fiduciaries changed the investment options from year to year," which "supports the inference that the fiduciaries were monitoring the investment options."); *Matney*, 80 F.4th 1136 at 1156 (allegations showing "the Plan's

---

[4] Whataburger is not arguing, as Plaintiff contends, that his claim fails because he is challenging only a minority of the Plan's investments. Opp. at 19–20. But Plaintiff cannot ask this Court to infer as part of the "context-specific inquiry" that Whataburger's fiduciary process was flawed based on the performance of two of the Plan funds when that fiduciary process yielded a fund lineup of which Plaintiff mostly has no performance criticisms and, overall, more than ninety percent of actively managed funds in the market underperform their benchmarks, according to Plaintiff.

---

recordkeeping fees became cheaper over time" contradicted any "reasonable inference that the Committee violated its fiduciary duty").

Plaintiff is left to argue that the two challenged funds experienced "net outflows." Opp. at 19. As a matter of law, however, net outflows to other investments are not indicative of imprudence. Mot. at 13, n.7 (*citing Smith v. CommonSpirit*, 37 F.4th 1160, 1162 (6th Cir. 2022). Regardless, these funds still have *billions* of dollars in them. Mot. at 12–13. In fact, according to Plaintiff's own allegations, a majority of money invested in these funds has stayed there. Compl. ¶¶ 44, 56. ECF No. 23–3 at 10, 16. Moreover, the Plan *is part of the outflows* Plaintiff alleges: the Plan had over $40 million invested in these two funds earlier in the putative class period, but reduced those holdings to less than $ 4 million, combined, by 2022. *Compare* ECF No. 23–3 at 10, 16 *with* ECF No. 23–3 at 14. Not only does this fact refute the unsupported assertion that Whataburger ignored outflows, it also underscores that the existence of outflows tells the Court little. There are many reasons for outflows. Plaintiff's cited caselaw does not move the needle: indeed, *all* the cases Plaintiff relies on to argue that outflows support a claim for fiduciary breach involved the Fidelity Freedom Funds, and those complaints (many of which were dismissed at the pleadings stage) also included many other allegations of imprudence, e.g., negative press reports and excessive fees. *See, e.g.*, *CommonSpirit Health*, 37 F.4th at 1164; *Coyer v. Univar Sols. USA Inc.*, 2022 WL 4534791, at *6 (N.D. Ill. Sept. 28, 2022). No such allegations are present here.

### 1.    Plaintiff's Performance-Based Allegations Do Note State a Claim

Whataburger's opening brief explained the well-established principle that nothing in ERISA "requires a fiduciary to pick the best performing fund," and following that principle, circuit courts have held that allegations that a few funds outperformed the challenged fund do not state a claim. Mot. at 20 (collecting cases). Plaintiff does not dispute this is the standard; he just disputes whether he has pled more than mere underperformance. Opp. at 21–23. Yet his opposition brief

does not point to any allegations in the Complaint that are something other than performance-based allegations, including the allegation that underperformance led to outflows. *Id*. And with no sense of irony, Plaintiff accuses Whataburger of "cherry-pick[ing] authorities" to support its argument by "relying heavily on *Locascio v. Fluor Corp*." *Id.* at 22. But *Locascio* is an on-point precedent—and the most relevant district court opinion to this Motion. And Plaintiff cannot avoid that *all* of the Courts of Appeals to consider the issue have reached similar conclusions in rejecting similar investment challenges. Mot. at 16–17; *Davis v. Wash. U. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020); *CommonSpirit*, 37 F.4th at 1166; *Matney v. Barrick Gold of N.A.*, 80 F.4th 1136, 1153 (10th Cir. 2023); *White v. Chevron Corp.* ("*White III*"), 752 F. App'x 453, 455 (9th Cir. 2018) (affirming dismissal of allegations that plan investment options underperformed benchmarks and other funds because they "showed only that [the defendant] could have chosen different vehicles for investment that performed better during the relevant period," which did not state a plausible claim).

## 2.      Plaintiff Has Failed to Provide Meaningful Benchmarks

Even if Plaintiff can create an inference of imprudence based on underperformance alone, he can only establish underperformance by comparing the challenged fund to a "meaningful benchmark." Mot. at 16–17. Whataburger's opening brief showed that Plaintiff failed to do so. *Id*. at 18–22. In response, Plaintiff seeks to avoid the "meaningful benchmark" inquiry altogether, arguing it is improper to consider on a motion to dismiss. Opp. at 23–24. This argument does not work; after all, the "meaningful benchmark" test was *created* at the Rule 12(b)(6) stage and *every* circuit court to consider the issue has held that a plaintiff must plead a meaningful benchmark to a plausible fiduciary breach claim. Mot. at 16 (citing cases in the Sixth, Seventh, Eighth, Ninth, and Tenth Circuit). So too did *Locascio*. *Id*.

Perhaps recognizing the weight of the circuit authority, Plaintiff spends far more time defending his "benchmarks" as meaningful. Opp. at 24–27. His tactics are unavailing.

*First*, Plaintiff compares the actively managed challenged funds to prospectus benchmark indexes, which are not investment funds at all. As the Eight Circuit recognized in *Davis*, "we are not persuaded that the Russell 3000 Index [prospectus benchmark], standing alone, is a 'meaningful benchmark' in this breach-of-fiduciary-duty case . . . [] After all, it is not a fund, much less an actively managed one . . . ." *Davis*, 960 F.3d at 485 n.4. Other courts agree. *See, e.g.*, Mot. at 18–19 (collecting cases). All Plaintiff offers in response are cases that predate or do not grapple with the now-widely followed *Davis* decision or are otherwise inapposite. Opp. at 24–25. For instance, Plaintiff relies on the Eighth Circuit's decision in *Braden*, but that is of no help. The Eighth Circuit in *Davis* specifically rejected the notion that *Braden* was persuasive on this issue, instead holding that *Braden* stood on different footing because it allowed a "comparison to market indices *as one factor among many* in allowing a breach-of-fiduciary-duty claim to proceed." *Davis, 960 F.3d at 485 n.4* (emphasis added). *Waldner v. Natixis Inv. Managers, L.P.* is similarly inapposite. 2021 WL 9038411, at *3. There, the plaintiff challenged the plan's propriety funds— which composed nearly two-third's of the plan's lineup—based on a number of allegations as to cost and *self-interest* that are not present here. *Waldner*, 2021 WL 9038411, at *3. Moreover, while the plaintiff claimed that four of the challenged proprietary funds underperformed their benchmark, they also alleged "specific comparator funds with similar investment styles and comparable or lower expenses. . . ." *Id*. Plaintiff makes no such allegations here. His caselaw is inconsequential, and Plaintiff's use of prospectus indexes are not meaningful benchmarks.

In addition, Whataburger also showed Plaintiff's prospectus benchmarks are not meaningful because Plaintiff's "prudent" actively managed alternative funds underperformed the

*same prospectus benchmark* that supposedly shows the MainStay Fund was imprudent. Mot. at 18–19. Whataburger asked: "How can the Russell 1000 Growth Index serve as a meaningful benchmark for evaluating the prudence of an investment option when Plaintiff's own alleged 'prudent' alternative trailed it too?" *Id*. Plaintiff has no answer, because there is none.

*Second*, Plaintiff compares each of the challenged funds to only two actively managed funds. Neither are sufficient. A benchmark is not meaningful if it only shares "some" similarities—it must involve a similar investment strategy, similar securities, and a similar risk profile. Mot. at 17 (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018)). Yet the Complaint includes none of this information about Plaintiff's comparators. That is not surprising because Whataburger showed that the challenged investments had different strategies (such as using derivatives), different investment allocations (such as investing in communication companies or not), and different aims (as reflected by having different prospectus benchmarks). Plaintiff does not, nor could he, dispute the accuracy of any of these assertions. Rather, he says these differences do not matter. Opp. at 26 (arguing "it is unremarkable to suggest that distinct investment products take distinct approaches . . ." and that it does not matter if the comparator fund has a "different strategy implementation"). Plaintiff is wrong: as the Eighth Circuit explained, "[t]he fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [Plan's funds] were an imprudent choice at the outset." *Meiners*, 898 F.3d at 823*; see also, e.g.*, *Smith*, 37 F.4th at 1167 (affirming Rule 12(b)(6) dismissal because funds with "separate goals and separate risk profiles" make "inapt comparators"); Mot. at 16 (collecting cases).

*Perkins*, which Plaintiff tries to minimize by noting it "was not selected for publication" (Opp. at 23, n. 15), is instructive. *Perkins v. United Surgical Partners Int'l, Inc.*,

2024 WL 1574342, at *3 (5th Cir. Apr. 11, 2024). There, plaintiff stated a claim by alleging two funds were "identical" in all ways except price. *Id.* Nothing of the sort is alleged here. By contrast, simply stating funds are comparable because they are in the same "category" (Opp. at 26–27) is the kind of generic label that is insufficient to establish a meaningful benchmark. *See, e.g.*, *Locascio*, 2023 WL 320000, at *6 ("simply labeling funds as 'comparable' or a 'peer' is insufficient to establish that those funds are meaningful benchmarks") (citing *Anderson v. Intel Corp.*, 2021 WL 229235, at *8 (N.D. Cal. Jan. 21, 2021)).[5]

*Davis*, on which Plaintiff relies (Opp. at 27), further illustrates how the Complaint here fails to provide a meaningful benchmark. In *Davis* plaintiffs alleged that defendants breached their fiduciary duties by retaining three different actively managed investments. 960 F.3d at 484. The Eighth Circuit upheld the dismissal of this claim as to each challenged fund because none of the proffered benchmarks were meaningful even in the Rule 12(b)(6) context. For example, the plaintiffs compared the challenged TIAA Real Estate Account to another real estate fund, the Vanguard REIT Index Fund. The Eighth Circuit held that this was not a meaningful benchmark because the "management approaches differ" and one "invests in intermediaries" while the other directly invests in "real-estate assets." *Id.* The Eighth Circuit likewise held that the plaintiffs' proposed comparators for the challenged CREF Stock Account were not meaningful benchmarks because the challenged fund "has holdings from around the globe, with around 30% of its portfolio

---

[5] In addition, moments after arguing there is no better way to judge a fund's performance than comparing it to its prospectus benchmark, Plaintiff turns around and says "it is of no moment" that his actively managed comparators "have different designated benchmarks" than the challenged funds. Opp. at 26. Plaintiff cannot have it both ways. According to Plaintiff, the "goals" of actively managed investments is to "add excess return compared to a given [prospectus] benchmark" (*id.* at 24), so if two active funds have different benchmarks, by Plaintiff's logic, they have different goals. As a matter of law, funds with "different goals" are not meaningful benchmarks. *Supra* at 12–13.

invested in international securities. The other funds, by contrast, have a lower percentage of international stocks." *Id.* And it dismissed the comparators for a third fund because the comparators had different "liquidity." *Id.* at 485. Thus, *Davis* demonstrates the level of detail and rigor courts use when applying the meaningful benchmark test in the Rule 12(b)(6) context, and that plaintiffs need to plead meaningful benchmarks. Their own *ipse dixit* is not sufficient. For the reasons described in Whataburger's opening brief and reiterated above, Plaintiff has fallen far short of pleading a meaningful benchmark.[6]

### 3. Plaintiff's Allegations of Short-Term, Intermittent, and Modest Underperformance Are Insufficient to State a Claim

Even if allegations of mere underperformance could state a claim and even if Plaintiff had identified meaningful benchmarks for the two challenged funds, his claim still fails because the underperformance he alleges is short-term, intermittent, and modest. Mot. at 22–24. Plaintiff does not dispute that he must allege long-term, consistent, and substantial underperformance. Opp. at 29 ("Plaintiff does[n't] [sic] contend that isolated and insubstantial concerns with an investment would support an inference of prudence."). Instead, he manipulates numbers to try to hide that his allegations fail to meet this standard. Stripped away of bluster and misdirection, Plaintiff's performance allegations do not plausibly suggest that the retention of the challenged funds from 2018 to the present was beyond the range of reasonable judgments a fiduciary may make.

---

[6] To the extent Plaintiff is arguing that there is some different rule for "investments that offer exposure to more than one asset class," that is not the law. Opp. at 27. And if it were, that would mean that all the target-date fund cases he cites—i.e., most of the cases he cites—are irrelevant. Target-date funds involve more than one asset class. Of note, the Eighth Circuit's decision in *Davis* and the Ninth Circuit's decision in *White III* involved single asset class funds like those at issue here. And the Sixth Circuit's decision in *CommonSpirit* involved both target date funds and non-target date single asset class funds.

*First*, Plaintiff plays games with time in an attempt to allege substantial underperformance. ERISA has a six-year statute of repose, and as Plaintiff's class definition reflects, the period covered by this litigation is March 27, 2018 to the present. 29 U.S.C. § 1103(1); Compl. ¶ 65. During this period, as Whataburger noted, Plaintiff never alleges the MainStay Fund underperformed by more than 1.00%. Mot. at 22. In response, Plaintiff argues he alleged the fund underperformed by more than 2% *prior* to the period covered by this litigation. Not only is that irrelevant, if anything, it shows that the MainStay Fund's performance improved during the putative class period.[7] Regardless, the kind of small numbers Plaintiff is talking about are below those other courts have found to be insubstantial. *See, e.g.*, *Cho v. Prudential Ins. Co. of Am.*, 2021 WL 4438186, at *9 (D.N.J. Sept. 27, 2021) (plaintiffs did not allege "sufficiently substantial" underperformance to state a claim as to fund for which "five-year trailing performance had underperformance percentages ranging from .07% to 3.71%," and "ten-year trailing performance reflected underperformance ranging from 1.19% to 2.86%"); *Forman v. TriHealth, Inc.*, 563 F. Supp. 3d 764 (S.D. Ohio 2021) (finding that underperformance ranging from 1.00% to "just over" 2.00% was "simply too small to raise a plausible breach of the fiduciary duty claim"), *aff'd in relevant part*, 40 F.4th 443 (6th Cir. 2022); *Bekker v. Neuberger Berman Grp. LLC*, 2018 WL 4636841, at *4 (S.D.N.Y. Sept. 27, 2018) (plaintiff failed to state a claim for imprudence based on retention of a fund that underperformed its benchmark by 4.48% over a ten-year period).

*Second*, Plaintiff tries to blend together his allegations to obscure the fact that he has not alleged consistent underperformance. For example, Whataburger explained that Plaintiff does not

---

[7] To illustrate, Plaintiff alleges that the MainStay Fund underperformed its prospectus benchmark by 2.72% in Q4 2017 but only by 0.08% in Q2 2019, meaning that 2018 and 2019 must have been good years for the fund. Compl. ¶¶ 32, 39. *See also id.* ¶ 38 ("[T]he MainStay Fund's three-year returns exhibited some modest improvement in 2019 and 2020[.]").

allege the Janus Fund underperformed in 2018, 2019, 2022, 2023, or 2024. Mot. at 23. For that matter, unlike the MainStay Fund, neither does Plaintiff allege that the Janus fund underperformed prior to the putative class period. While Plaintiff's response calls the Janus's Fund underperformance "lengthy," he identifies no allegation or case law that two years of alleged underperformance is lengthy, instead pivoting to the amount of underperformance. Opp. at 29. *C.f. Locascio,* 2023 WL 320000 at *1 ("Sometimes stock underperform."); *Smith,* 37 F.4th at 1166 ("Merely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision—largely a process-based inquiry—that breaches a fiduciary duty.").

*Third*, Plaintiff mixes and matches his reporting periods to try to make it appear there was continuous underperformance when there was not. For example, Whataburger pointed out that in every year of the putative class period Plaintiff was only able to identify a single Plan fund whose three-year returns underperformed that of its prospectus benchmark. In response, Plaintiff argues that in 2020 he alleged that two Plan funds underperformed as measured by five-year returns. Mot. at 29. This is doubly damaging. At best, Plaintiff has identified one out of six years where more than one Plan fund allegedly underperformed by some metric. And more tellingly, he manages to identify that single year only by omitting one of the two metrics (three-year returns) that *he chose*.

No matter how considered, Plaintiff has not plead long-term, substantial, and consistent underperformance for either of the two challenged funds. For this reason too, Plaintiff's breach of fiduciary duty claim should be dismissed.

### B.  Because Plaintiff's Prudence Claim Fails, So Too Do His Derivative Claims

The parties agree that if Plaintiff's underlying breach of fiduciary duty claim fails (Count I), so too does his derivative breach of the duty to monitor (Count II) and knowing breach

of trust (Count III) claims. Mot. at 25–26; Opp. at 30. Because the prudence claim fails, so too do the derivative claims.

## III.   <u>**CONCLUSION**</u>

For the reasons identified in Whataburger's opening and reply briefs, the Court should dismiss this lawsuit both because Plaintiff lacks standing to bring it and its claims are implausible.

Dated: July 15, 2024

By:   */s/ Lauren A. Valkenaar*
Lauren A. Valkenaar
Texas Bar No. 24088570
VALKENAAR PLLC
7898 Broadway, Suite 120
San Antonio, TX 78209
Telephone: +1.210.239.0321
Facsimile: +1.210.634.2566
lvalkenaar@valkenaarlaw.com

*/s/ Jeremy P. Blumenfeld*
Jeremy P. Blumenfeld (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103–2921
Telephone: +1.215.963.5000
Facsimile: +1.215.963.5001
jeremy.blumenfeld@morganlewis.com

*/s/ Keri L. Engelman*
Keri L. Engelman, (pro hac vice)
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110–1726
Telephone: +1.617.341.7700
Facsimile: +1.617.341.7701
keri.engelman@morganlewis.com

*/s/ Samuel D. Block*
Samuel D. Block (pro hac vice)
Christopher B. Dempsey
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, IL 60606–1511
Telephone: +1.312.324.1000
Facsimile: +1.312.324.1001
samuel.block@morganlewis.com
chris.dempsey@morganlewis.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via the Court's ECF/CM e-filing system to all counsel of record who are deemed to have consented to electronic service on this 15th day of July 2024.

*/s/ Lauren A. Valkenaar*